**Shannon J. BATTLE, Roy Tatum, Jr., Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 97–CF–1644, 97–CF–1775.

District of Columbia Court of Appeals.

Argued April 18, 2000.

Decided June 1, 2000.

---

M. Elizabeth Kent, Washington, DC, appointed by this court, for appellant Battle.

Peter H. Meyers, appointed by this court, for appellant Tatum.

Elizabeth H. Carroll, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, REID, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge.

In this appeal from appellants' joint murder convictions arising from the shooting death of Ronald Thomas, the primary issue concerns the trial court's exclusion of evidence proffered by Battle to show that another person so closely resembling him that he had been mistaken for Battle committed a similar (non-fatal) shooting two weeks before the murder with one of the same pistols used in the murder. After originally charging Battle with the earlier assault, the government dismissed the charge when records appeared to show that Battle had been confined at the Oak Hill juvenile detention center at the time of the shooting. We agree with Battle that the trial court erred in excluding evidence of the earlier shooting, which was relevant under "reverse *Drew/Winfield*" principles established by our cases. We remand the record for additional inquiry and findings by the trial court to aid us in considering the effect of the error on the jury's conviction of Battle. As to appellant Tatum, we find no basis on which to reverse any of his convictions.

## I.

On the evening of December 7, 1993, three men dressed in black surrounded Ronald Thomas' car parked on I Street, N.E., and together fired numerous pistol shots into the car, killing Thomas. Three eyewitnesses, neighborhood girls aged 13 to 17 at the time, all identified appellant Battle as one of the shooters. The first witness, Arnita Smith, had known Battle and co-appellant Tatum "for a long time," having gone to junior high school with them and sometimes seen them together at school. On the night in question, Smith

was walking up I Street with Eva Mack and Kentoura Donaldson when she saw Battle "walk up to the car and just start shooting at [Thomas]." Battle, Tatum, and an unknown third young man had positioned themselves on three sides of the car. All three fired shots at the car but Battle, standing on the street side of the parked car, had fired first: he "pull[ed] the gun out and just start[ed] shooting." [1] Smith was certain that Battle was one of the shooters.

Kentoura Donaldson likewise testified that she was with Smith and Mack on December 7 when she saw Battle, Tatum, and a third "boy[ ] place[ ] [themselves] around [Thomas's] car, one ... on the passenger's side, one ... on the driver's side, and one ... in the back." (Before this, Donaldson had heard another young man standing nearby ask Battle, "[W]hat's up, Shannon?") The three began shooting at the car at the same time. When Kentoura turned and started running away, she heard the shots continue and then saw the shooters run away through an alley. She recognized Battle because she had known him since elementary school. She would see him and Tatum "[s]tanding around ... [d]own by [the] Langston [neighborhood]"; "[t]hey would be together all the time." Asked whether she had seen Battle's face during the shooting, she answered: "You could see him. You know it was him." [2]

Eva Mack, the third eyewitness, was standing with the other girls in an alley off I Street when she saw some "boys ... [s]hooting at [Thomas's] car." She recognized Battle as one of them because she had "know[n] him from [her] sister" for two years; she had seen him "a couple of times" including once "[w]hen he was trying to talk to [her] sister." She had also

---

1. Photographic evidence established that both the passenger's side and the driver's side windows of Thomas's car had been shot out. A large number of shell casings and bullets were recovered from Thomas's body and the surrounding area.

2. Since the night of the shooting, Kentoura had not talked to Smith or Mack "about what happened." All three girls had "moved," and she had not seen the others "in a while."

seen Battle and Tatum together. Although a third man was near the car at the time of the shooting, Mack saw only Battle and Tatum firing at the car. Her back had originally been turned to the car, but when she heard the first shot she turned around and "saw Shannon's face." She "g[o]t a good look at him that night" and was sure he was one of the shooters.

One of the guns used in the murder was a Glock nine millimeter pistol. Ten days after the shooting police stopped a car in which Battle was a passenger and found that pistol in his waistband. Tatum was also a passenger in the car. A month and half later, police recovered another pistol used in the shooting from a duffle bag on the rear floor of a car in which Battle was riding as a back seat passenger. It was stipulated to the jury that a week before the murder Tatum had been in possession of both of these handguns.

## II. The Reverse-*Drew*/*Winfield* Issue

### A.

Battle's defense was alibi and thus misidentification. Before trial, he moved to admit evidence of another shooting that had taken place on November 25, 1993, two weeks before the charged homicide. Battle had apparently been identified by the victim of that (non-fatal) shooting from a photo array as the assailant, and the government had charged Battle with the assault. (The criminal complaint in that case named the victim only as "John Doe.") It later dismissed the charge, however, when an examination of the records at the Oak Hill juvenile facility appeared to show that Battle has been confined there on November 25.[3] Besides what Battle thus alleged was his misidentifica-

tion as someone closely resembling him, the government had established that one of the same guns later used to shoot Ronald Thomas had been used to shoot "John Doe." On the basis of these similarities and the fact that the shootings were separated by only two weeks and took place within a few blocks of each other, Battle sought to introduce proof of the earlier shooting as "reverse *Drew*" evidence to raise a reasonable doubt whether he—rather than the unknown assailant on November 25— had shot Thomas. Battle also requested discovery of the identity of "John Doe" and all information the government had about the circumstances of that shooting.

At a hearing on the motion, Battle renewed his request for discovery and admission at trial of the November 25 misidentification. In response, the prosecutor stated that "the paper trail" had indeed indicated that Battle had been at Oak Hill at the time of the November shooting, so that the government had dismissed that charge against him after concluding "it could not prove its case beyond a reasonable doubt." The prosecutor asserted, however, that the Oak Hill custody records "were in complete disarray" according to a detective who had reviewed them, and that an examination of daily passes from the facility to see if Battle had been issued one for November 25 was impossible "because they were in boxes all over the floor."[4] As to the identification of Battle, the prosecutor stated that "John Doe" had been "reinterviewed and has stated that his initial identification [of Battle] was correct."

In a written memorandum and order, the trial judge (Burnett, J.) denied the motion to admit evidence of the earlier shooting. He stated, in summary:

3. Battle represented in the motion that "Oak Hill Staff, at the request of the government, [had] personally reviewed Oak Hill detention records, and even reviewed the day pass book for November 25, 1993, to confirm that Mr. Battle was detained at Oak Hill on that day, and that he did not receive a pass on November 25, 1993."

4. The prosecutor also asserted that Oak Hill "is a facility that can be walked away from and is walked away from on a regular basis." Regarding the same gun being used in both shootings, the prosecutor pointed to information he had given the defense that "a number of people ... had [had] access to this murder weapon over a period of about thirty-five days."

The fact that another person, not a witness to the crimes which are the subject of the trial, misidentified the defendant in another crime incident has no probative value in this case, for different individuals have different observation and recall abilities. The fact that the same gun was allegedly used in both crimes also is of no substantial significance, as guns can readily pass from one person to another on a daily basis. Nor has counsel for the defendant shown that degree or remarkable similarity as to establish that the two (2) offenses are so alike or unique that they would constitute "signature" crimes and support a rational conclusion that they both were committed by the same person.

Further, according to the judge, the evidence of the November 25 shooting would "be collateral and would inject unwarranted confusion into the trial."

### B.

■ Battle contends that the judge's determination that the November 25 shooting had "no probative value" and so was inadmissible on whether he committed the charged murder is inconsistent with our decisions affirming a defendant's right to offer such evidence to create a reasonable doubt that he committed the charged offense. We agree. Taken at face value, Battle's proffer was that someone resembling him closely—so closely that he had been mistaken for Battle—had shot the occupant of a car using one of the guns used to kill Ronald Thomas only two weeks later in the same neighborhood. Ordinary principles of relevance, as defined by our cases, dictate that that evidence was probative enough to require its admission.

The relevancy issue has been framed by our decisions as the admissibility of " 'defensive' or 'reverse' *Drew* " evidence,[5]

**5.** *See Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

**6.** That is the standard laid down in *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.

*Newman v. United States,* 705 A.2d 246, 255 (D.C.1997), corresponding to the introduction of "other crimes" evidence by the government to prove (for example) a defendant's identity or intent. *See also Morris v. United States,* 622 A.2d 1116, 1127 & n. 24 (D.C.1993). In *Newman,* however, quoting with approval the Supreme Court of New Jersey, we explained that while other crimes evidence offered by the prosecution requires close similarity between offenses to guard against conviction of a defendant based on "propensity," the same is not true when the evidence is used defensively:

> [W]hen the defendant is offering that kind of proof exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility, since ordinarily, and subject to rules of competency, an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made.

*Newman,* 705 A.2d at 255 (citation and internal quotation marks omitted). In *Newman,* we drew a parallel between this standard and the test for admission of "a particular species of 'reverse' *Drew* evidence" established in *Winfield v. United States,* 676 A.2d 1 (D.C.1996) (en banc), *i.e.,* "third-party perpetrator evidence." *Id.* at 3. We reiterated in *Newman* (quoting *Winfield* ) that "there is only one standard of relevance"[6] and that, to be admissible under that standard, proffered evidence "need only tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Newman,* 705 A.2d at 255 (internal quotation marks omitted). Further, while the trial judge must consider too whether the probative value of that evidence "outweighs the hazard of jury

1977): "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence."

confusion" from hearing proof of uncharged conduct, we made clear that that concern is unlike—and not nearly as grave as—the risk that a jury will draw an inference of criminal disposition from the government's use of other crimes evidence. *Id.* at 260 (citations and internal quotation marks omitted). We therefore emphasized, as we had in *Winfield,* "that 'the trial court must resolve close questions of admissibility in this setting in favor of inclusion, not exclusion,' because a defendant's constitutional right of 'a meaningful opportunity to present a complete defense' is implicated." *Id.* at 256 (quoting *Winfield,* 676 A.2d at 6–7) (other citation and internal quotation marks omitted).

Applying these standards, we hold that the trial judge should have admitted the evidence of the November 25 shooting.[7] Proof that another person bearing a very close resemblance to Battle (provided, of course, it was not Battle himself) shot a man in a car in the same neighborhood with the same gun used to shoot Thomas surely "tend[ed] to indicate some *reasonable possibility* that a person other than" Battle shot Thomas two weeks later. *Newman,* 705 A.2d at 255 (emphasis added). It is true, as the government points out, that the unknown third person was not shown to have had any motive or opportunity to shoot Thomas. But that was also true in *Newman* (and, as to motive, is true of Battle himself), and we nonetheless found the similarities between the charged and uncharged assaults in *Newman* sufficient to "demonstrat[e] a 'reasonable possibility' that someone other than [defendant] Samuels committed" both crimes. *Id.* at 257; *see also id.* (evidence of the earlier assault " '*tended* to create a reasonable doubt that [Samuels] committed the offense' " charged (emphasis in original; citation omitted)).

The government argues that the similarities in *Newman* were stronger in revealing a modus operandi than they are here, but it does not dispute Battle's assertion that "the government would [or at least might] have been able to introduce evidence of the November 25 ... shooting had there not been a misidentification issue" (Govt. Br. at 43 n. 28, paraphrasing Battle's argument). Even in the usual *Drew* setting, our decisions have not required "the presence of one distinctive similarity" but rather an "amalgamat[ion]" of like circumstances to support admission of other acts. *Gates v. United States,* 481 A.2d 120, 123 (D.C. 1984). And we stated in *Newman* that "if the evidence *could* have been admitted in a standard *Drew* context, it presumptively *should* be admitted in a 'reverse *Drew*' context." *Newman,* 705 A.2d at 260 (emphasis in original). *Newman* and *Winfield* together establish "simple relevance to guilt ... as the standard of admissibility" for defensive use of other crimes evidence. *Newman,* 705 A.2d at 255 (citation and internal quotation marks omitted). The distinctive features of use of the same gun in both shootings, by a person misidentified as Battle (if the Oak Hill evidence is believed), in assaults occurring only two weeks and several blocks apart from one another, easily satisfied that standard.

The government asserts that proof of the November 25 shooting would have required a veritable "trial-within-a-trial," *Winfield,* 676 A.2d at 5, because the government necessarily would have challenged Battle's theory of misidentification by calling the victim of the earlier shooting as a witness and presenting evidence as to the "disarray" of the Oak Hill records and their failure to establish conclusively Battle's presence there at the time in question. As explained earlier, "a trial judge must weigh the probative value of the proffered evidence against the possibility

7. We note that, although the en banc *Winfield* decision pre-dated the trial judge's ruling in this case, the *Newman* decision tying *Winfield* to the standard for admission of "reverse *Drew*" evidence did not.

of jury confusion if the defense evidence, coupled with the government's rebuttal, would become a distracting mini-trial." *Newman,* 705 A.2d at 259 (citation omitted). But, as we have also pointed out, that concern is subordinate to the defendant's constitutional right to mount a complete defense, including misidentification. *Id.* at 260. In this case the trial judge's concern that evidence of the November 25 shooting "would inject ... confusion into the trial" is too generalized. Battle presumably would have sought to prove little more than that the victim of the shooting had identified him as the shooter, and that records the government itself relied on in dismissing the charge showed he could not have been the perpetrator. (Indeed, Battle might naturally have preferred a stipulation that the victim identified him to live testimony by a witness accusing him of a second armed assault.) The remainder of the evidence on the issue likely would have been the government's rebuttal of the "misidentification," proof it could restrict if it feared jury distraction from the December 7 events. Moreover, an accumulation of evidence about the November 25 shooting realistically would have harmed Battle as much as the prosecution, by undermining the simplicity of his defense that a look-alike (indeed, his double) had done the shooting because he himself was incarcerated. In these circumstances, the concern with the jury being distracted by consideration of the events of November 25 could not properly be invoked to deny Battle the right to adduce relevant evidence.

### C.

■ The question we still must decide is whether the erroneous exclusion of the evidence was harmless error. The government concedes that, because the proffered evidence went "to the heart of the defense

theory" of misidentification, *Newman,* 705 A.2d at 258 (citation and internal quotation marks omitted), we must analyze for constitutional harmless error, asking "whether the exclusion of the proffered evidence was harmless beyond a reasonable doubt." *Id.* We inquire, in other words, whether the government has demonstrated "beyond a reasonable doubt that the error ... did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[8]

■ The government's case was admittedly a strong one. It consisted chiefly of eyewitness testimony and evidence that Battle possessed two of the guns used to shoot Thomas during the two months following the shooting. Three teenage girls each identified Battle as one of three men who had surrounded Thomas's car and fired repeated shots into it. All of them recognized Battle as someone they knew from school or through family; all were positive that Battle was one of the shooters. Two had seen Battle and Tatum together in the past, one recalling that "[t]hey would be together all the time." None could identify the third assailant. No evidence pointed to any opportunity the witnesses had had to contrive a common story. (Kentoura Donaldson testified that each of them had "moved" since the shooting.) No evidence or impeachment significantly challenged their opportunity to observe the shooting, and no bias or motive was imputed to any of them to identify Battle falsely.

Battle points out that the government presented no evidence of lineup or photographic identifications made by the girls, and that testimony by two of the girls that they had made written (Smith) or oral (Mack) statements to the police shortly after the shooting was contradicted by a

---

**8.** Battle does not contend that the erroneous exclusion affected the jury's conviction of him for carrying a pistol without a license based on his possession of the Glock pistol on December 17, 1993. We agree with that concession and therefore will affirm that conviction without more.

detective.[9] These shortcomings, however, are substantially offset by the corroboration which the girls' testimony received from Battle's possession of the Glock nine millimeter pistol, in company with Tatum, ten days after the shooting and his possession of another of the murder weapons six weeks later. Tatum's admission to possessing both weapons a week before the murder further solidified the link between Battle and himself as the shooters.[10] Moreover, Battle's defense of alibi—*i.e.,* that he had been incarcerated from November 8 to December 7, 1993, had been picked up at the juvenile receiving home by his uncle between 9:30 and 10:00 that evening (the killing took place shortly after 9:00 p.m.), and had gone directly home and spent the night with his grandfather, father, and aunt—was not supported by any testimony but his own.

Nevertheless, the exclusion of evidence of the November 25 shooting remains troubling. Our concern is not primarily Battle's argument that evidence of the shooting would have weakened the inference from his possession of the murder weapons after the killing by showing the ready access that others (or another) had to the Glock pistol. (Regardless of who possessed the pistol on November 25, by December 1 both murder weapons had passed into the possession of Tatum, whom the eyewitness and other testimony linked to Battle and the murder.) The concern rather is the larger one that exclusion of the evidence relieved the jury of having to come to grips with the possibility that Battle had been mistaken for the murderer just as he had been mistaken for the shooter on November 25 who used the same Glock pistol. That concern is only partly ameliorated by the risk which Battle faced that the jury would find no mistake in the earlier identification and thereby convert the "reverse *Drew*" evidence into confirmation of his guilt.

In his pretrial motion, Battle sought discovery of the identity of "John Doe," all knowledge the government had regarding his identification of the assailant, and any information it had tending to show Battle's confinement at Oak Hill on November 25. The trial judge's exclusion of all evidence of the shooting leaves us unconvinced that the government has had the necessary incentive to examine its files for potentially exculpatory information responsive to those demands. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We therefore believe that the proper disposition at this point is a remand to the trial court for additional inquiry about the November 25 events and Battle's whereabouts at the time.

Precedent for such a remand and hearing in aid of this court's determination of harmless error *vel non* is furnished by *Davis v. United States,* 564 A.2d 31 (D.C. 1989) (en banc). There the trial court had erroneously failed to conduct the inquiry required in order to sustain a claim of fifth amendment privilege by a witness whom the defense had sought to call at trial. "Because the nature of the trial court's error rendered the record inadequate for the appellate panel to determine whether the error was harmless under … *Chapman v. California,*" it remanded "for further proceedings and directed the trial court to determine, on the basis of the supplemented record, whether the error was harmless beyond a reasonable doubt." *Id.* at 33, 87 S.Ct. 824. The en banc court subsequently ruled that the ultimate determination of constitutional harmlessness (or not) is a legal one concerning which the appellate court has "a 'constitutional responsibility that cannot be delegated to the

---

9. The detective did testify that Smith had identified Battle "as the person she saw shooting Ronald Thomas" in a statement made in August 1994, eight to nine months after the shooting.

10. Although that testimony was admitted by way of a stipulation between Tatum and the government, Battle sought no instruction preventing the jury from considering it as circumstantial evidence of the link between himself, Tatum, and the Thomas shooting.

trier of fact.'" *Id.* at 39–40, 87 S.Ct. 824 (citation omitted). But, at the same time, we recognized "the unique operational advantage of the trial judge" in finding "historical or subsidiary facts (as well as reasonable inferences deduced therefrom)." *Id.* at 34, 87 S.Ct. 824.

Following the *Davis* example, we will remand this case for a hearing, preceded by conscientious examination of its files by the prosecution, at which evidence is adduced about the November 25 shooting and what kind of reverse *Drew/Winfield* defense Battle could have presented, including the circumstances of John Doe's (and any other related) identifications of the shooter and the facts regarding Battle's confinement or not at the time. The trial judge should make appropriate findings[11] and transmit the supplemented record to us, enabling us to make a fully informed decision on the ultimate issue.

### III.

■ Appellants both argue that the prosecutor's failure to present the testimony of a medical examiner or to introduce an autopsy report resulted in a failure to prove the cause of death. On the facts of this case, in which eyewitnesses testified that appellants fired multiple shots at Thomas and police witnesses described the condition of Thomas' body after the shooting, this argument has no merit.

■ Although medical testimony is certainly the preferred manner of proving cause of death, it is not indispensable when the evidence is such "that any layman of average intelligence would know from his own knowledge and experience that the injuries were the cause of death." *Hall v. Commonwealth,* 819 S.W.2d 39, 40 (Ky.Ct. App.1991) (discussing *Harvey v. Commonwealth,* 318 S.W.2d 868, 870 (Ky.1958), *overruled on other grounds by Commonwealth v. Burge,* 947 S.W.2d 805 (Ky. 1996)). *See also State v. Croka,* 693 S.W.2d 133, 134 (Mo.Ct.App.1985); *Hall v. State,* 269 Ind. 24, 378 N.E.2d 823, 827 (1978). Here, a detective arrived on the scene immediately after he heard gunshots, and found Thomas with multiple gunshot wounds and no pulse; "it was apparent [to him] that [Thomas] was dead." A police sergeant saw Thomas's dead body on a gurney in the hospital with gunshot wounds "on the left upper arm, the left neck, and left chest, the left shoulder, and then about 10 gunshot wounds in the back." Thomas's death certificate was admitted into evidence, and properly so as a business record. *See Bowman v. Redding & Co.,* 145 U.S.App.D.C. 294, 299, 449 F.2d 956, 961 (1971).[12] It listed in detail the internal injuries through bullet wounds that had caused Thomas's death. As a practical matter, cause of death was not an issue.

### IV.

■ Appellant Tatum makes essentially two claims of improper closing argument by the prosecutor. First, he contends that the prosecutor repeatedly characterized the government witnesses' testimony as "truthful" and Tatum's testimony as "untruthful." He concedes that our review is for plain error since he objected to none of

---

**11.** These findings, if made by the judge who presided at trial, will inevitably include the judge's own evaluation of the strength of whatever exculpatory evidence is adduced taking into account his "intimate acquaintance with the facts of the particular case." *Davis,* 564 A.2d at 34. Recently the Supreme Court confirmed the need for courts of appeals to " 'be constantly alert' to 'the trial judge's first-hand knowledge of witnesses, testimony, and issues,' ... the first-instance decisionmaker's 'feel' for the overall case," even though "the court of appeals has authority to render the final decision." *Weisgram v. Marley Co.,* —— U.S. ——, ——, 120 S.Ct. 1011, 1015, 145 L.Ed.2d 958 (2000) (internal quotation marks partly omitted).

**12.** Thus we need not consider appellant's argument, made for the first time on appeal, that it could not be admitted under D.C.Code § 11–2310 (1995) (records maintained by Chief Medical Examiner) because it lacked the necessary certification.

these characterizations. *See Watts v. United States*, 362 A.2d 706, 708 (D.C. 1976) (en banc). We find no error there at all. Nothing in the argument implied that the prosecutor had extra-record knowledge enabling him to vouch for the "truth." In part he merely capitalized on Tatum's admission on the stand that he had given a false name to the police when arrested ("if he's willing to lie about who he is, how can you credit his testimony?"). *See McGrier v. United States*, 597 A.2d 36, 43–44 (D.C. 1991) ("The prosecutor's remarks were nothing more than an argument that the jury could reasonably infer from the very facts which the defense had stipulated that [the defense witnesses] were not telling the truth."). Further, when the prosecutor urged the jury to "[l]isten to the truth. And the truth is these two gentlemen are guilty of first degree murder," he added: "That's the only verdict that's consistent with the evidence in the case." The jurors could certainly be asked to infer the truth—and judge the truthfulness of witnesses—from the evidence in the case.

■ Second, Tatum cites as improper the prosecutor's argument in rebuttal when, after reminding the jury of the courage the three teenage witnesses had shown in testifying,[13] he closed with this peroration:

> And the bottom line is this, it's your job to do justice here. It's your job to do justice for Ronald Charles Thomas. It's your job to do justice for Eva Mack, Kentoura Donaldson and Arnita Smith. Why did they testify here; because it was the right thing to do. They testified for you.
>
> Ladies and gentlemen, it has to stop. And the only way it can stop is if they're willing to sit there and tell you about it.

This argument was objectionable. It went beyond a perhaps innocuous appeal to the jury "to do justice." It implied that after the witnesses had done their part in summoning the courage to testify, now it was the jury's turn to do justice not only for the victim but for the witnesses too: a not-guilty verdict would somehow be unfaithful to them. Also, unless witnesses like Smith, Donaldson and Mack came forward and testified (and were believed), "it" would not "stop"—the "it" being a not so veiled allusion to a larger procession of senseless killings illustrated by this case.

■ Counsel for Tatum did not object to the argument, but Battle's attorney did, and the trial judge admonished the prosecutor: "I think that is going a little far." Neither defense counsel asked for additional relief. The judge immediately began final instructions by telling the jury: "Ladies and gentlemen, your duty is to decide the case based on the evidence and the law and I'll give you your instructions." A few paragraphs later he cautioned them that "[t]he attorneys' statements and arguments are not evidence."

The prosecutor's final remarks, while improper, provide no grounds for reversal. Assuming that Tatum may avail himself of Battle's objection to them, *see Williams v. United States*, 382 A.2d 1, 7 n. 12 (D.C. 1978), no mistrial was asked for, and none would have been required. Instead, if requested, the judge could have told the jury to disregard the remarks because its responsibility was not "to do justice" in some broad sense—much less to the victim · or the prosecution's witnesses—but rather to decide whether appellants were guilty or not based on the evidence and the instructions given them. And, indeed, the judge partly told the jury just that after appellants did not ask for any instruction more pointedly curative. Tatum can claim no error in the judge's failure to afford an additional, unsolicited remedy. *See Irick v. United States*, 565 A.2d 26, 33 (D.C. 1989) (the appellate court's ultimate focus is not on the prosecutor's misdeeds, but "on what the judge did or failed to do").

---

**13.** Typical of them, Arnita Smith had testified—sometimes with apparent tears—that she was scared in being asked to testify, "because of what [she had seen]."

## V.

To summarize, we affirm Battle's conviction for carrying a pistol without a license on December 17, 1993, see note 8, *supra,* and we affirm all of Tatum's convictions. With respect to Battle's remaining convictions, we remand the record for further inquiry and findings as discussed in part II. C., *supra.*

*So ordered.*