**Darryl A. HUNTER, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 06–CF–539.**

District of Columbia Court of Appeals.

Argued Jan. 9, 2008.
Decided Sept. 17, 2009.

Alice Wang, Public Defender Service, with whom James Klein, Public Defender Service, was on brief, for appellant.

Mary Chris Dobbie, Assistant United States Attorney, with whom Jeffrey A. Taylor, United State Attorney at the time the brief was filed, Roy W. McLeese III, Thomas J. Tourish, Jr., and Precious Murchison, Assistant United States Attorneys, were on the brief, for appellee.

Before KRAMER, BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

KRAMER, Associate Judge:

Appellant Darryl Hunter was charged by indictment with eight counts stemming from a shooting following a dispute with his estranged wife and his subsequent assaults of her mother and sister.[1] Hunter was acquitted of assault with a deadly weapon (ADW), carrying a pistol without a license (CPWL), and one count of simple assault, but was convicted of possession of an unregistered firearm (UF), unlawful possession of ammunition (UA), two counts of threatening to injure a person (felony threats), and one count of simple assault. Hunter appeals all of his convictions except the one count of simple assault. Specifically, Hunter argues that the trial court erred in excluding evidence of a third party's convictions for armed drug trafficking—evidence Hunter characterizes as "reverse-*Drew* or *Winfield* evidence"—and that the felony threat counts merge into

one offense under the Double Jeopardy Clause. We affirm.

## I. Factual Background

The events of October 6, 2004, accounted for four of the charges brought against Hunter—ADW, CPWL, UF, and UA. As noted above, Hunter was acquitted of the ADW and CPWL charges, but convicted of the UF and UA charges.

The government's evidence with respect to October 6, 2004, came in primarily through LaTonya Parker, Hunter's sister-in-law. LaTonya testified that on October 6 she was driving her minivan with her toddler and her sister Lynette as passengers when she saw Hunter, Lynette's estranged husband, with his new girlfriend, Juanitra Cashwell, in Ms. Cashwell's car. Lynette directed LaTonya to drive up next to Cashwell's car and Lynette and Hunter got out of their respective vehicles and talked in the middle of the street. Lynette asked him for the remote control to the apartment complex where they had lived and the keys to the apartment they shared. Hunter gave her the remote control, but kept the keys. Hunter and Cashwell then drove away, as did LaTonya and Lynette. Shortly thereafter, however, Cashwell pulled over and Lynette told LaTonya that she thought Hunter had something to say, so LaTonya pulled over also and double-parked beside Cashwell. Hunter jumped out of Cashwell's car, walked into the middle of the street, lifted up his shirt to display a handgun in his waistband, then walked behind the van that LaTonya was driving, pointed the gun and fired one shot. LaTonya was able to see that the weapon was "silver and

---

1. The charges were assault with a dangerous weapon, in violation of D.C.Code § 22–402; carrying a pistol without a license, in violation of D.C.Code § 22–4504(a); possession of an unregistered firearm, in violation of D.C.Code § 7–2502.01; unlawful possession

of ammunition, in violation of D.C.Code § 7–2506.01; two counts of assault, in violation of D.C.Code § 22–404; and two counts of threatening to injure a person (felony threats), in violation of D.C.Code § 22–1810 (2001).

black." She testified to seeing smoke come out of the barrel when Hunter raised the gun and fired at the back of the van, but the van was not hit.

The sisters immediately went home and told their mother, Annie Mae Parker, what had happened. Their mother called 911. When the police responded, both sisters reported the events to them. The police found no damage to the van, however, nor could they locate a spent cartridge at the scene of the shooting, but as Officer Meyers testified, an "expended shell would only be approximately ... a half inch or just more than a half inch long," and the area where the police were searching was illuminated solely by street lights.

One week after the October 6 incident, Hunter went to retrieve his belongings from the apartment he shared with Lynette only to find that the locks had been changed. Hunter then went to Annie Mae Parker's home and began pounding on the door. Annie Mae let him in, and he began "screaming and hollering obscenities." LaTonya Parker testified that Hunter shouted, "I will bust you in your face. I will blow your f* *king head off," toward Annie Mae. Annie Mae testified that she believed Hunter was going to hit her. Hunter then began arguing with LaTonya. He struck her in the face and began to leave the premises. Annie Mae testified that he said, "I'm going home get my sh*t, and when I come back, I'm blowing somebody away." LaTonya testified that he said, "I'm going to kill all of you mother f* *kers." On cross-examination, LaTonya testified that he "threatened to kill me, my mother, and my children."

Lynette, however, recanted at trial what she had told the police on October 6, as well as her grand jury testimony, both of which had corresponded with LaTonya's version, and testified that because she was angry to see Hunter with Cashwell, she had made up the entire shooting incident.

She also testified that she had known there was a silver and black gun in Cashwell's apartment because Cashwell had shown it to her at a time preceding the events of October 6, and that had provided the basis for the description of the gun that she gave to the police.

Cashwell, who was also called as a witness by the government, testified that Hunter had kept his belongings in her hall closet (as well as in her living room). The government showed her a picture of a gun that had been found in a makeup case in that closet during a search warrant executed at her apartment. She testified that Hunter had been in her apartment earlier on the day the police executed the warrant. On cross-examination, the defense brought out that Willie Mouling, Cashwell's former boyfriend, had been living in her apartment until he was arrested and incarcerated in March 2004 (about eight months before the events at issue here), and that his belongings had been left there in the same closet. The gun that was recovered was a black and silver semi-automatic .9 mm caliber pistol.

The defense attempted to introduce Mouling's unrelated convictions for drug trafficking while armed and possession of a weapon by a felon apparently so that the jury might infer from these convictions that Hunter was not guilty of the charges arising from the events of October 6. Specifically, Hunter sought to introduce evidence to suggest that the gun found by the police in a makeup case during the execution of a search warrant at Cashwell's apartment on October 21 belonged to Mouling, not to him.

The trial court first indicated that the defense could be raised if it could be proven "competently," but not merely through cross-examination or putting on evidence of Mouling's convictions for drug trafficking while armed and possession of a hand-

gun by a felon. The court's concern was that the evidence would be "back-door character testimony about someone else's propensity for violence," but the court indicated that direct evidence from a witness who had seen Mouling with the weapon would be permissible. Indeed, Hunter's counsel attempted to elicit such testimony from Ms. Cashwell, but her description of the gun in the closet differed from that provided to the police by LaTonya and Lynette. Specifically, Cashwell testified that the gun she had seen in her apartment was "smokey—like gray or a dark color," not silver—substantially undermining the defense effort to establish that the gun used by Hunter on October 6 was Mouling's, not his. In the end, the trial court ruled that simply putting on evidence of the existence of Mouling's convictions would have no real probative value, especially since the gun Mouling had been convicted of possessing in connection with the drug trafficking charge had been recovered and seized, and thus would not have been available for LaTonya to identify in court.[2]

## II. The Threats Convictions

■ Hunter contends that his two felony threat convictions should merge because they are based on the same conduct, namely one threat to two individuals. The Double Jeopardy Clause of the Fifth Amendment prohibits "multiple punishments for the same offense." *Lennon v. United States*, 736 A.2d 208, 209 (D.C. 1999) (citation omitted). Hunter contends that the government tried his case on the theory that he committed two counts of felony threats when he uttered a single threat directed collectively at Annie Mae Parker and her daughter, LaTonya. We review claims of violation of the Double Jeopardy Clause and the merger of convictions *de novo, Joiner–Die v. United States*, 899 A.2d 762, 766 (D.C.2006), employing a "fact-based" analysis to determine whether two violations of the same statute merge. *Ellison v. United States*, 919 A.2d 612, 615 (D.C.2007). If there was only one threat, the two convictions should merge, but "[t]he Fifth Amendment does not prohibit separate and cumulative punishment for separate criminal acts." *Owens v. United States*, 497 A.2d 1086, 1094–95 (D.C.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986).

Hunter argues that the government presented evidence of only one threat addressed to two individuals, and that the conduct described by Annie Mae and La-Tonya Parker amount to the same conduct. He argues that we should follow our holding in *Smith v. United States*, 295 A.2d 60 (D.C.1972). In *Smith*, the defendant threatened two men, a father and son, who pursued him after catching him breaking into the father's car. Smith patted his pocket and told the men he had a gun. They broke off their pursuit, fearing for their safety. *Id.* We vacated one of Smith's threat convictions, holding that there was only one threat, and that "[t]he statute evidences no clear intent to transform this one act into as many offenses as there [were] individuals threatened." *Id.* at 61. We decline to follow *Smith* in this instance, as Hunter's conduct represents two distinct threats to two individuals.

We are guided in our decision by our holding in *Joiner v. United States*, 585 A.2d 176 (D.C.1991). In *Joiner*, the appel-

---

**2.** The defense also argued that because the gun used in Mouling's crimes was from the same manufacturer as the gun thought to have been used here (the defense theory being that both were Rugers), the gun really belonged to Mouling. The fact that the weapon that Hunter was accused of possessing (and using) on October 6 was not recovered at the time of this incident, however, makes that virtually impossible to prove without more evidence than was presented here.

lant threatened two men who had identified him in a police lineup a few days earlier. He "pointed to each man, first touching [the first victim's] nose and then striking [the other victim] above the eye, while uttering 'I will remember this,' 'I will get you for this' and '[I don't] forget faces.'" *Id.* at 178. We reasoned that it was "clear from these facts that appellant distinctly singled out and focused on each of the two victims while uttering words and physically touching them, one after the other." *Id.* at 179. We concluded, on that basis, that Joiner committed two separate offenses under the felony threats statute.

■ As was the case in *Joiner*, Hunter issued two distinct threats to two different victims. A defendant is guilty of threats if he utters words to another person, those words were of such a nature as to convey fear of serious bodily harm to the ordinary hearer, and the defendant intended to utter the words as a threat. *Jenkins v. United States*, 902 A.2d 79, 86 (D.C.2006). Here, Hunter uttered one threat directed to Annie Mae Parker when he told her, "I will bust you in your face. I will blow your f* *king head off." He uttered a new, distinct threat when he directed his attention to LaTonya, striking her and uttering a second threat, directed to both victims collectively, as he left the premises. Since these threats took place sequentially, as opposed to being one act directed at an undifferentiated group of victims, the convictions do not merge.

### III. Exclusion of Mouling's Convictions

■ Hunter also asserts on appeal that the trial court erred by not admitting evidence of Mouling's prior convictions for drug trafficking while armed and possession of a Ruger P90 pistol in March 2004 because "the defense theory was that the loaded Ruger P89 found in Ms. Cashwell's hallway closet [during the execution of the search warrant for Cashwell's apartment] belonged to Mr. Mouling," and those convictions would help "demonstrate that Mr. Mouling had a reason to possess the [recovered P89] gun and a preference for Rugers." He characterizes this as "reverse-*Drew* evidence." In *Bruce v. United States*, 820 A.2d 540, 543 (D.C.2003), we explained that "[r]everse *Drew* evidence is 'evidence of a recent, similar crime with a distinct modus operandi—which the defendant could be shown not to have committed' and is 'admissible as tending to prove that someone other than the defendant committed the crime charged.'" *Id.* at 543 (quoting *Newman v. United States*, 705 A.2d 246, 253 (D.C.1997)). *Bruce* contrasted reverse-*Drew* evidence with *Winfield* evidence, *see Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc) (*Winfield II*), which "while similar, 'tends to show that someone other than the defendant was the real culprit.... *Winfield* evidence may, but does not necessarily, reflect that someone other than the defendant had committed another crime like the one before the court.'" *Bruce, supra*, 820 A.2d at 543 (quoting *Newman, supra*, 705 A.2d at 254). Admissibility under *Winfield* requires that there be "proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Winfield, supra*, 676 A.2d at 4. Since the evidence Hunter sought to introduce does not indicate any possibility that someone else committed the charged offense, that is, possession of an unregistered firearm and unlawful possession of ammunition on October 6, it was neither *Winfield* nor reverse-*Drew* evidence, and Hunter's argument to the contrary must fail.

■ Contrary to the trial court's findings, however, the evidence did have

probative value; therefore, the trial court erred in denying the convictions' admission on the ground that they had none. A trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion. *Goines v. United States*, 905 A.2d 795, 799 (D.C.2006); *Mercer v. United States*, 724 A.2d 1176, 1182 (D.C.1999). However, "the exercise of that discretion must 'be founded upon correct legal principles.' It is an abuse of discretion if the trial [court] rests [its] 'conclusions on incorrect legal standards.' " *Bell v. United States*, 801 A.2d 117, 125 (D.C.2002) (citations omitted). "Relevant evidence means evidence having *any tendency* to make the existence of any fact that is of consequence more or less probable than it would be without the evidence." *Foreman v. United States*, 792 A.2d 1043, 1049 (D.C.2002) (emphasis added). "The 'any tendency' threshold of relevance is relatively easy to surmount; evidence certainly need not be unambiguous to have some probative value." *Comford v. United States*, 947 A.2d 1181, 1187 (D.C.2008). Nonetheless, the admissibility of evidence is subject to the general rule that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Jones v. United States*, 739 A.2d 348, 351 (D.C.1999).

Here, Hunter sought to introduce Mouling's convictions as evidence that Mouling was a drug dealer who had a motive to have an additional gun hidden in the apartment where he had formerly lived. In light of the government's emphasis, in its opening and closing arguments, that the P89 Ruger found in the closet bolstered LaTonya's testimony about the ADW on October 6 because it supported an inference that Hunter had ready access to a gun, Mouling's convictions for drug trafficking while armed with a P90 Ruger were relevant under the "any tendency" standard because they had at least some tendency, albeit slight, to prove that Hunter did not know about the gun or have ready access to it (presumably because Mouling had secretly hidden it there without Hunter's realizing it, even though Hunter had also stored some of his belongings in the closet where the gun was found). Therefore, the trial court erred in finding that the convictions had no relevance.

■ ■ Nonetheless, we hold that this error was harmless.[3] Because the error complained of was preserved, to affirm the court must be able to conclude "with fair assurance, after pondering all that happened without stripping the erroneous actions from the whole, that the judgment was not substantially swayed by the error." *Rorie v. United States*, 882 A.2d 763, 776 (D.C.2005) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). We conclude that the judgment was not substantially swayed by the error in this case because (1) Hunter's threat that he would "blow [Annie Mae's] f* *king head off" was strong evidence that he had access to a gun; (2) the fact that Mouling's P90 Ruger had been

---

**3.** While the standard of review applicable to erroneously-excluded reverse-*Drew* evidence depends on whether the evidence went to "the heart of the defense theory," *Newman v. United States*, 705 A.2d 246, 258 (D.C.1997) (noting that erroneously-excluded reverse-*Drew* evidence that went to the "heart of the defense theory" is reviewed for constitutional harmless error, while all other erroneously-excluded reverse-*Drew* evidence is reviewed for non-constitutional harmless error) (quotation marks omitted), this case does not involve erroneously-excluded reverse-*Drew* evidence. *See* II., *supra*. Therefore, we review for non-constitutional harmless error under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), without regard to whether the erroneously-excluded evidence in this case went to the "heart of the defense theory."

recovered by police lessens the force of the argument that the P89 Ruger was also Mouling's; (3) the fact that Cashwell had shown the closeted gun to Lynnette suggests that she might have shown it to Hunter also; (4) the court would have allowed testimony from someone who had seen Mouling with the P89 found in the closet; (5) the jury was never instructed on constructive possession, making it unlikely that the jury convicted Hunter based solely on the gun found in the closet; and (6) the trial court was justified in trying to prevent jury confusion by keeping out evidence of limited probative value. *See Jones, supra,* 739 A.2d at 351 (holding that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"). Moreover, ownership of the gun was not a dispositive fact; access to the gun was. Therefore, although the trial court erred in holding that Mouling's convictions were ir-

relevant, that error was harmless, and we affirm Hunter's convictions for UF, UA, and felony threats.[4]

For the foregoing reasons, the appellant's convictions are

*Affirmed.*[5]

Opinion for the court by Associate Judge KRAMER.

BLACKBURNE–RIGSBY, Associate Judge, concurring in part and dissenting in part:

I concur with the majority's decision to affirm the appellant's convictions for felony threats arising out of the events on October 13, 2004. However, I write separately to note my view that the trial court improperly excluded the evidence appellant sought to introduce regarding Mr. Mouling's conviction for armed drug trafficking with a Ruger P90 semi-automatic pistol.[1]

---

**4.** Hunter's brief makes an oblique reference to the fact that the jury acquitted him of the charges of ADW and CPWL, while convicting him of the UF and UA charges. Without more, however, it is difficult to see what relevance that has to the issues presented here. The jury's decision to acquit on those charges would appear to have been the result of a compromise verdict, which under the law of this jurisdiction is not to be disturbed. *See Haynesworth v. United States,* 473 A.2d 366, 368 (D.C.1984) ("Inconsistent criminal verdicts rendered by a jury should not be disturbed"). *See also McClain v. United States,* 871 A.2d 1185, 1193 (D.C.2005) (quoting *Fisher v. United States,* 749 A.2d 710, 713 (D.C.2000) (citing to *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932)))("At least since 1932, the Supreme Court has made clear that courts are not to inquire into the thinking of a jury with respect to inconsistent verdicts in a single trial.").

**5.** Hunter also argues for the first time on appeal that his UF and UA convictions violate his Second Amendment rights. This argument also fails because (a) there was no evidence that Hunter possessed the weapon for self-defense purposes (indeed, Hunter's defense was that he never possessed the gun or

ammunition at all), and (b) the licensing statutes Hunter challenges are not facially unconstitutional or invalid. *See Howerton v. United States,* 964 A.2d 1282, 1287, 1289 (D.C.2009) ("[A]s the Supreme Court reasoned in [*District of Columbia v.*] *Heller,* [128 S.Ct. 2783 (2008),] the Second Amendment protects 'bearing arms for a lawful purpose' by 'law-abiding, responsible citizens ... in defense of hearth and home.' ... That does not mean, however, that any of the particular statutes at issue here is facially invalid. Notably, the Supreme Court in *Heller* did not declare invalid any of the individual statutes under which appellant ... was convicted. Moreover, to make a successful facial challenge to the statutes in issue here, appellant 'must establish that no set of circumstances exists under which [they] would be valid.' It is not 'plain' that appellant can show that with respect to the statutes under which he was charged and convicted." (citations omitted)).

**1.** Mr. Mouling was the prior boyfriend of appellant's girlfriend, who resided in the apartment and stored his belongings in the closet where the gun was found.

Instead, I conclude that the evidence should have been admitted as relevant and probative because the evidence created doubt that Mr. Hunter could have possessed the gun, which was found hidden inside a makeup case, inside a closet with Mr. Mouling's belongings, in an apartment in which Mr. Mouling resided prior to his conviction.[2] Therefore, exclusion of the evidence was not harmless.

In my view, exclusion of the evidence was not harmless because the ability to present exculpatory evidence that someone other than Mr. Hunter owned the gun went "to the heart of the defense theory."[3] *See Battle v. United States*, 754 A.2d 312, 318 (D.C.2000); *McCoy v. United States*, 760 A.2d 164, 175 (D.C.2000); *Newman v. United States*, 705 A.2d 246, 258 (D.C. 1997) ("*Newman I*"). The government must demonstrate " 'beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained.' " *Battle, supra*, 754 A.2d at 318 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). In this instance, the government has not met this burden. The government asserts that the error was harmless because Mr. Hunter was not precluded from eliciting facts for the jury to consider regarding the possibility that the

gun belonged to Mr. Mouling. For example, evidence was admitted that Mr. Mouling had access to the closet and that he carried a gun. But, Mr. Hunter was not able to introduce evidence showing that the gun Mr. Mouling was convicted of possessing was the same make as the gun found in the closet—a fact that would weigh in favor of showing that the gun in the closet belonged to Mr. Mouling. The government also points out that, in closing argument, Mr. Hunter emphasized that Mr. Mouling had been "locked up," and possessed a gun in the past. However, when Mr. Hunter attempted to argue that these facts made it more likely that Mr. Mouling possessed two guns, the government objected and the trial court sustained the objection.

The government contends that the only excluded evidence from appellant's third-party-perpetrator defense was the nature of Mr. Mouling's prior convictions, and therefore there was no harm in excluding the evidence. This contention fails to take into account that it is precisely the nature of those convictions that would have shown that it was more likely that the gun in the closet belonged to Mr. Mouling and not Mr. Hunter. The fact that the trial court would have permitted testimony from

---

2. The majority contends, and I agree, that this evidence does not fit squarely within the ambit of reverse-*Drew* or *Winfield* evidence because Mr. Hunter is not being charged with a crime related to the discovery of the gun in the closet on October 21, 2004. However, while evidence of Mr. Mouling's convictions would not have been introduced to exonerate Mr. Hunter of the ADW charge for October 6th, and therefore was not technically reverse-*Drew* or *Winfield* evidence, Mr. Mouling's convictions tend to make it less likely that Hunter had a gun on October 6th. Thus, the evidence should have been admitted based on the same principle underlying admission of reverse-*Drew* or *Winfield* evidence—a defendant's constitutional right to mount a complete defense. *See, e.g., Battle v. United States*, 754 A.2d 312, 318 (D.C.2000).

3. The majority asserts that because this evidence did not go to the heart of the defense's theory, and further that it was not reverse-*Drew* evidence, the *Kotteakos* non-constitutional harmless error standard applies. Although I concede that this is not reverse-*Drew* evidence per se, because, in my view, the proffered evidence goes to the heart of the defense theory, I review under the more stringent *Chapman* constitutional harmless error standard. *See Newman I, supra*, 705 A.2d at 257–58 (holding that the error of excluding the extrinsic evidence was of "constitutional magnitude violating [appellant's] Sixth Amendment right" because the evidence went "to the core of the defense") (internal quotation marks and citation omitted).

someone who had seen Mr. Mouling with the gun found in the closet falls short of what allowing evidence of the convictions would have achieved—showing *why* it is more likely than not that the gun belonged to Mr. Mouling. Nor did the trial judge's willingness to allow testimony from someone who saw Mr. Mouling with the gun render the exclusion of the evidence harmless. While it may have been a reasonable alternative if prejudice were a concern, there was no such issue at stake here where Mr. Mouling was not the person on trial.

The only evidence that supported the unlawful firearm and unlawful possession of ammunition charge was LaTonya's testimony[4] that she saw Mr. Hunter shoot a gun at the van on October 6, 2004, and the discovery of a loaded gun in Ms. Cashwell's apartment, where Mr. Hunter was staying. Lynette directly contradicted her sister's testimony and admitted that she and her sister had fabricated the story about Mr. Hunter having a gun on October 6th in an effort to get back at him for leaving her for another woman. No other witness claimed to have seen Mr. Hunter with a gun, no other witness heard a gun fired, and there were no fingerprints or any other physical evidence to link Mr. Hunter to the gun or ammunition. Further, there is no evidence in the record to suggest that either Ms. Cashwell or Lynette[5] showed Mr. Hunter the gun or even told him about it.

Establishing Mr. Mouling's ownership of and secret storage of the gun was critical to corroborating the defense's theory that Mr. Hunter did not have knowledge of the gun and therefore could not have possessed it on October 6th. Possessing a gun and/or ammunition requires knowledge and intent. *See Inyamah v. United States*, 956 A.2d 58, 62 n. 5 (D.C.2008) (noting that to establish Possession of an Unregistered Firearm, the government must prove beyond a reasonable doubt, that the defendant possessed a firearm *knowingly and intentionally*, and that the firearm had not been registered to the defendant as required by District of Columbia law); *see Fields v. United States*, 698 A.2d 485, 491 (D.C.1997) (stating that the government must prove beyond a reasonable doubt that the defendant possessed ammunition, and did so *knowingly and intentionally*, to establish Unlawful Possession of Ammunition). While ownership of the gun by someone else does not entirely negate appellant's ability to have possessed the gun, it does lend support to appellant's claim that he lacked knowledge of the gun in the closet and therefore could not have possessed *that* gun. This made the evidence of Mr. Mouling's ownership of the gun more probative to show whether or not Mr. Hunter in fact could have possessed it on the night of October 6th, particularly in light of appellant's contention that he never had any gun on October 6th.

Appellant points to his acquittal of the CPWL charges to bolster his argument that he did not have a gun on the night of October 6th. The government and Mr. Hunter have differing views regarding the meaning of the jury's failure to convict him for CPWL. The government contends that the verdict represents a compromise, and

---

4. A reasonable juror could have questioned LaTonya's credibility if he credited Lynette's recantation of her testimony that she saw Mr. Hunter fire the gun on October 6, 2004.

5. Lynette testified that Ms. Cashwell had shown her a gun in the closet of Ms. Cashwell's apartment. The jury was presented with that evidence and could have drawn the inference that Lynette may have told Mr. Hunter about it. Nevertheless, it is speculative to assume that Ms. Cashwell or Lynette did tell Mr. Hunter about the gun where there is no evidence on the record to support the contention.

that although the jury acquitted Mr. Hunter of CPWL on October 6th, it nonetheless convicted him of UF and UA for having possession of the firearm in the street on the same day. Mr. Hunter contends that, because the jury acquitted him of CPWL, the jury more likely concluded that he possessed the gun found in the hallway closet, on October 21st.

We have declined to second guess jury verdicts even in cases where the verdicts are inconsistent with one another. *McClain v. United States*, 871 A.2d 1185, 1193 (2005). But while even an obvious inconsistency in the jury verdicts may not be a basis for reversing judgment, it may be used to illustrate the point that each piece of evidence relied upon by the parties was critical to their arguments, thereby making admission of Mr. Mouling's conviction more probative and relevant, and not harmless. *See id.* at 1191 (citation omitted).

Here, the government relied on the gun recovered from within the closet specifically to bolster their contention that the appellant had a gun on October 6th—and not just that he had *a* gun, but that he had *this* gun. Without giving the appellant every opportunity to show why the government's theory was flawed because appellant did not *own* or *know* about the gun the government introduced into evidence, appellant was deprived of his constitutional right to put on a full defense. Even if the probative value of this evidence was, as the government stated, "marginal," which I do not concede, the prejudice to appellant's constitutional right to put forth a full defense weighs strongly in favor of admission. *See, e.g., Newman II*, 810 A.2d 918, 924 (D.C.2002)(stating "the trial court must evaluate potential prejudice resulting from jury confusion against [the] 'strong constitutional interest in a meaningful opportunity to present a complete defense[.]' ")(quoting *Newman I*, 705 A.2d at 260); *see also Newman II*, 810 A.2d at 923 (stating "the concern about potential jury confusion is 'subordinate to the defendant's constitutional right to mount a complete defense.' " (citation omitted)).

Mr. Hunter attempted to introduce Mr. Mouling's conviction for drug trafficking while armed with a Ruger P90 to prove that Mr. Mouling had the motive to possess a similar gun—a Ruger P89—hidden in the hallway closet where he resided until his conviction sent him to jail. Mr. Hunter asserts that "drug trafficking is a dangerous trade, drug dealers have a natural incentive to possess guns for protection, and the fact that Mr. Mouling was an armed drug dealer in March 2004 showed that he had a motive to keep guns in Ms. Cashwell's apartment, where he resided at the time." Mr. Mouling's prior conviction for drug trafficking with a similar Ruger semiautomatic gun, demonstrating his motive to possess a Ruger because of his drug trafficking activity, was probative of his ownership of the Ruger P89 in Ms. Cashwell's closet, because it cast some doubt that Mr. Hunter even knew about the gun hidden inside the closet and inside the green makeup case with Mr. Mouling's other belongings in Ms. Cashwell's apartment.[6]

---

**6.** *See Reed v. United States*, 828 A.2d 159, 163 (D.C.2003) (recognizing relationship between drugs and weapons); *Peay v. United States*, 597 A.2d 1318, 1321 (D.C.1991) (en banc) (observing drugs and weapons often go together); *Irick v. United States*, 565 A.2d 26, 31 (D.C.1989) (stating connection between drugs and guns was helpful to a jury); *see also United States v. Payne*, 805 F.2d 1062, 1065, (D.C.Cir.1986) (citations omitted) (noting that drug dealers possess firearms and "that such weapons are as much tools of the trade as more commonly recognized drug paraphernalia"). Furthermore, we have allowed evidence of possession of drug money to be admitted to show a defendant's motive to possess a gun. *Bigelow v. United States*, 498 A.2d 210, 213–

The totality of the circumstances in this case demonstrated that the gun found in Ms. Cashwell's closet more likely belonged to Mr. Mouling instead of Mr. Hunter and therefore was probative of Mr. Hunter's ability to possess the gun. *See e.g., McCoy v. United States*, 760 A.2d 164, 175 (D.C.2000) (stating that the totality of the circumstances were a basis for admission of the evidence and noting that when the question of admissibility is close, admission rather than exclusion should be favored). The evidence Mr. Hunter was permitted to introduce at trial arguably only went so far as to demonstrate Mr. Mouling's opportunity to hide the gun in the closet, *not his motive*.[7] The defense's ability to fully demonstrate to the jury the likelihood that the gun belonged to someone other than the appellant was impeded by the trial judge's decision not to admit this evidence. Thus, Mr. Mouling's prior conviction was probative and relevant and should have been admitted. *See Johnson v. United States, supra*, 552 A.2d 513, 516 (D.C.1989) (proffered evidence only needs to create a possibility that someone other than the defendant committed the charged crime to be admissible). Similarly, Mr. Hunter was thwarted from putting forth his full de-

fense when the trial court sustained objections by the government when Mr. Hunter attempted to link the gun found in the closet to Mr. Mouling.[8]

The majority concedes that this evidence was relevant and probative to showing that "Hunter did not know about the gun or have ready access to it." The government introduced into evidence the silver and black Ruger P89 for the express purpose of proving that it was *the gun* that Mr. Hunter was accused of possessing on October 6th. In its opening statement the government stated "you will learn that when the defendant was arrested on October 21st at the apartment he shared with [Ms. Cashwell] the police found a loaded .9mm handgun that was silver and black, consistent with the gun witnesses saw him having on October 6th." The government elicited from LaTonya, appellant's sister-in-law, details about a silver and black gun. The government also questioned an officer about his familiarity with a shell casing of a bullet from a .9mm gun. In closing arguments the government reminded the jury that witnesses had identified Mr. Hunter as having a silver and black gun consistent with the *one found in Ms. Cashwell's closet*. Clearly, central to the gov-

---

14 (D.C.1985). It was also undisputed at trial that Mr. Mouling lived with Ms. Cashwell prior to his incarceration and that he had access to the hallway closet and stored his belongings there, which provided him with "the practical opportunity to commit the crime." *McCoy, supra*, 760 A.2d at 173 (quoting *Winfield, supra*, 676 A.2d at 5).

7. This type of evidence "may, but does not necessarily, reflect that someone other than the defendant had committed another crime like the one before the court; but even when a prior crime is not involved, the evidence can be admissible because the proffered *motive* and *opportunity* to commit the crime are probative of criminality in the way that *Drew* or 'reverse' *Drew* evidence is probative." *Newman I, supra* note 3, 705 A.2d at 254. (emphasis added). To be admissible, the

crimes do not need to be identical so long as the "the totality of the circumstances demonstrates a reasonable probability that the [third party committed both crimes]." *McCoy, supra*, 760 A.2d at 175 (D.C.2000) (quoting *Newman I, supra*, 705 A.2d at 257)). Again, while I acknowledge that evidence of Mr. Mouling's convictions is not reverse-*Drew* or *Winfield* evidence per se, a defendant's constitutional right to mount a complete defense is the paramount principle which warrants admission.

8. For example, Mr. Hunter was allowed to argue that Mr. Mouling was "locked up" and had a gun in the past, but when he attempted to argue that there was a possibility that these facts made it more likely that Mr. Mouling possessed two guns, the government objected and the trial court sustained the objection.

ernment's presentation of its case to the jury was the implication that the gun the police found in the closet on October 21st was the gun Mr. Hunter possessed on October 6th. This is why appellant's theory at trial focused on Mr. Hunter having no knowledge that the gun was in the closet and denying that he possessed it on October 6th. In opening statements the defense posited:

> The government wants you to believe that just because they found a gun in Cashwell's apartment, Mr. Hunter had something to do with this. That's just not the case. And you'll hear that the gun belonged to someone else. You'll hear that the gun was in Ms. Cashwell's apartment well before Mr. Hunter ever moved in, and you'll hear that Mr. Hunter knew nothing about that gun.

In addition, the defense elicited testimony from Lynette Parker, the ex-wife of Mr. Hunter, that she made up the story that Mr. Hunter brandished a gun or shot at the van. She testified that on the way home she and her sister LaTonya planned to "get Mr. Hunter in trouble" by accusing him of shooting at their vehicle. She knew the police would find the black and silver gun in Ms. Cashwell's apartment. Lynette knew that Mr. Hunter was staying with Ms. Cashwell, who had previously shown Lynette a black and silver gun that was in her closet months before Mr. Hunter moved in with Ms. Cashwell. Given the specific facts of this case and the defense's theory that the facts were fabricated to get Mr. Hunter in trouble, the evidence regarding who owned the gun was very relevant. Ownership by Mr. Mouling of the gun recovered on October 21st, on the facts of this case, was probative of Mr. Hunter's ability to possess the gun. Thus, Mr. Hunter's ability to put forth a full defense was stymied by the court's disallowance of Mr. Mouling's prior conviction for armed drug trafficking into evidence.

"[T]he trial court must resolve close questions of admissibility in this setting in favor of inclusion, not exclusion [because] a defendant's constitutional right to 'a meaningful opportunity to present a complete defense' " is implicated. *Winfield, supra,* 676 A.2d at 6–7 (quoting in part *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). Even though this evidence is not directly within the ambit of reverse-*Drew* or *Winfield* evidence, its exclusion impeded appellant's Sixth Amendment right. This case, in my view, was a "close one" and under this principle, the evidence should have been admitted. I conclude that the erroneously excluded evidence contributed to the verdict obtained for the UF and UA convictions and therefore, it was not a harmless error.

For all the foregoing reasons, I respectfully *dissent.*