Michael L. NEWMAN and Delonte B. Samuels, Appellants,

v.

UNITED STATES, Appellee.

No. 98–CO–1348, 98–CO–1456.

District of Columbia Court of Appeals.

Argued Dec. 14, 2000.

Decided Nov. 27, 2002.

Dennis M. Hart, Washington, DC, for Delonte B. Samuels.

Brett E. Cohen for Michael L. Newman.

Jelahn Stewart, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and John J. Soroka, Assistant United States Attorneys, were on brief for the appellee.

Before FARRELL, RUIZ, and WASHINGTON, Associate Judges.

RUIZ, Associate Judge:

This is the second appeal by Michael Newman and Delonte Samuels involving their conviction for the death of Rudy Williams.[1] In their first appeal, we held

---

1. Newman and Samuels were convicted of two counts of felony murder, *see* D.C.Code § 22–2401 (1996) (recodified as D.C.Code § 22–2101 (2001)), second-degree murder, *see* D.C.Code § 22–2403, first-degree burglary while armed, *see* D.C.Code § 22–1801, armed robbery, *see* D.C.Code § 22–2901, possession of a firearm during a crime of violence, *see* D.C.Code §§ 22–3202(a), 3204(b) and carrying a pistol without a license, *see* D.C.Code § 22–3204.

that the trial court erred when it applied the wrong standard in excluding Samuels' proffered evidence of other, similar crimes by a third party ("*Winfield* "[2] evidence), and denied Newman's motion for a new trial pursuant to D.C.Code § 23–110 without a hearing. *See Newman v. United States,* 705 A.2d 246, 265 (D.C.1997). The case was remanded to determine whether Samuels' testimony should have been admitted under the proper legal standard, and, if so, to conduct a new trial, *see id.* at 260, and to hold a hearing on Newman's collateral attack. *See id.* at 265. The trial court conducted those hearings, and concluded that Samuels' *Winfield* evidence was properly excluded, and that Newman had failed to show ineffective assistance of counsel under the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ We hold that the trial court's determination that Samuels' *Winfield* evidence was irrelevant is erroneous, as well as its alternative holding that the possibility of jury confusion arising from a trial-within-a-trial would greatly outweigh any probative value that such evidence might have. "Relevant evidence is that which *tends* to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States,* 377 A.2d 1353, 1358 (D.C. 1977) (citation omitted) (emphasis added). Samuels' proposed evidence meets this standard. Although the trial court found the testimony to be less than convincing, "there is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense." *Winfield v. United States,* 676 A.2d 1, 4 (D.C.1996). The court's alternative justification is equally insufficient. Concern over a trial-within-a-trial is "subordinate to the defendant's constitutional right to mount a complete defense, including misidentification." *Battle v. United States,* 754 A.2d 312, 318 (D.C.2000). Where, as here, the *Winfield* evidence is not cumulative, is otherwise admissible, and no other factor suggests significant prejudice, it must be admitted. As we have already determined that if the evidence was admissible, its exclusion was not harmless beyond a reasonable doubt, *see Newman,* 705 A.2d at 258, we reverse the trial court's exclusion of Samuels' *Winfield* evidence, and remand for a new trial as to Samuels.

We see no abuse of discretion in the trial court's evaluation of Newman's ineffective assistance of counsel claim, however, and affirm the trial court's denial of his claim.

## I. Facts

The evidence presented at appellants' second trial[3] showed that three friends, Rudy Williams, Robert Harvey and Reuben Nicholas, visited the home of Sharon Bost, a prostitute, to solicit sex. *Id.* at 249. After drinking and perhaps taking drugs in Bost's apartment, Williams asked Bost if she had any "friends." *Id.* Bost returned with Theresa Hungerford. *Id.* Although Williams flirted with Hungerford, Nicholas suggested that Williams might prefer Bost. *Id.* Insulted, Hungerford left, and is alleged to have returned ten minutes later with appellants Michael Newman and Delonte Samuels, who "burst" armed into the apartment and ordered Williams, Harvey and Nicholas to "give it up" or be killed. *Id.* at 250 Although Harvey and Nicholas complied with their assailants' requests, Williams resisted Hungerford's attempt to search his pockets. *Id.* This led to a struggle be-

---

**2.** *Winfield v. United States,* 676 A.2d 1 (D.C. 1996).

**3.** The first trial of Newman and Samuels ended in a mistrial because of the illness of a juror.

tween Williams and Newman. Samuels stood nearby, attempting to assist Newman. During the melée, Newman's gun fell to the ground, the gun discharged, and Williams was mortally wounded. *Id.*

Samuels contended that Hungerford had been involved in a similar robbery with other accomplices, and offered evidence that it was those individuals who committed the Williams murder.[4] In his proffer, Samuels alleged that Theresa Hungerford met a man named Keith Bego and invited him to an apartment about two weeks prior to the Williams killing. When they reached the apartment, Bego saw four individuals: a woman in her 50s or 60s, two men, and a young woman. Hungerford left for a back bedroom with another young woman, inviting Bego to join them. He did. The men and women that Bego had seen earlier then burst into the bedroom, attacked Bego, and attempted to remove his pants and shoes. In the fighting, Hungerford yelled "give it up" and cut Bego on the right forearm with a pair of scissors. After taking his pants, shoes and money, the group ordered Bego out. Bego later identified Hungerford to the police as the person who cut him with scissors. After viewing Samuels at his trial, Bego said that Samuels was definitely not involved in his robbery.

The trial court excluded evidence of the Bego robbery as irrelevant. On appeal, we reversed, reasoning that because the crimes took place only two weeks apart, "concerned similar modes of operation in that Hungerford initially socialized, and attempted to negotiate a transaction, with the victims—possibly ascertaining that they had money—before attempting a rob-

bery," "[a]nd in both cases, the robbers required the victims to remove their shoes, socks and pants, and told them to 'give it up,'" the proffered evidence satisfied the *Winfield* standard and was also relevant to Hungerford's bias.[5] *Newman,* 705 A.2d at 256–57. Because this court required "the benefit of the trial judge's perceptions about the reliability of that proffer," *id.* at 259, however, the case was remanded to "evaluate whether the evidence available is in keeping with the proffer and whether its probative value outweighs the hazard of jury confusion." *Id.* at 260.

At the evidentiary hearing, and under cross examination, Bego's testimony diverged from the proffer. Bego testified that his fight began not with men bursting into the bedroom, but with his decision to withdraw from a sex-for-money arrangement with the women. Bego testified that, as he withdrew, the women attempted to search his pockets. The three struggled, and Hungerford cut Bego with scissors *before* the male attackers entered. Bego testified that the other attackers entered *because* of the fight between him and the two women:

> Q. What happened? Who said what to get them [the men from the front room] to rush in?
>
> A. I guess the loud, the talking and stuff … I have to say the loud talking and [they] just came gang busting into the apartment.

The trial court found these differences to be significant. The court understood the proffer as describing a preplanned robbery in which Hungerford "lured the vic-

---

4. Harvey, Nicholas and Hungerford identified Samuels as one of the assailants, but as we pointed out in our previous opinion in this case, their testimony could have been "discounted" by the jury for several reasons, and there was no physical evidence tying Samuels to the crime. *Newman,* 705 A.2d at 258.

5. The bias would have been Hungerford's interest in shielding the identity of her "real accomplices both from the earlier and the present, more serious crime." *Newman,* 705 A.2d at 254.

tim to the apartment and prearranged a bold and sudden strike by outsiders for the purpose of robbing [Bego] ... of his money roll." The court held that Bego's testimony, on the other hand, suggested that the robbery was nothing more than an unintended consequence of a disagreement between a prostitute and a potential client, joined later by others alerted by the commotion. Even if, *arguendo,* the Bego testimony were found to be minimally relevant, the court held that the "difficulty and confusion [of] having to try a second complicated matter within an otherwise unconnected murder trial" would greatly exceed its value.

## II. Analysis

### 1. *Samuels' Extrinsic Evidence.*

█ The trial court based its evaluation of the relevance of Bego's testimony on the search for a consistent pattern in both crimes, assuming that evidence of the Bego robbery would be relevant only if Hungerford and her accomplices were serial robbers with a distinctive methodology for trapping and taking money from their victim. We think this is too narrow a conception of relevance, particularly when it pertains to the accused's right to present a defense. As we noted in the opinion remanding the case, because reverse *Drew* evidence is offered "exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice ... as an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made." *Newman,* 705 A.2d at 255.

█ Under the *Winfield* standard for admission of evidence that someone other than the defendant perpetrated the charged crime, the defendant need not al-

lege that other crimes are so similar to the matter at bar that they would be considered "signature" crimes. *See McCoy v. United States,* 760 A.2d 164, 175 (D.C. 2000) (rejecting the government's argument that *Winfield* evidence is inadmissible because the two homicides involved were not signature crimes). The test is whether the "totality of the circumstances" tends to show that another party might be culpable for the crime at bar. *See id.; see also Battle,* 754 A.2d at 317 (explaining that the decisions of this court "have not required the presence of one distinctive similarity but rather an amalgamation of like circumstances to support admission of other acts").

That standard is met here. The evidence places Hungerford, together with male accomplices, at the center of two similar robberies within two weeks, both arising in the context of a sex-for-money meeting with Hungerford. Bego's testimony on remand matched a central feature of the proffer that Samuels, whose presence at the second robbery is contested, was not present at the first. As we stated in remanding the case based only on the proffer, "Bego's testimony that Samuels was not present [at the first robbery] ... was converted, powerfully, into 'reverse-*Drew*' evidence in his favor."[6] *Newman,* 705 A.2d at 257. This alone "tend[s] to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Winfield,* 676 A.2d at 5 (citation omitted). A fact-finder could reasonably infer that Hungerford relied on the same individuals to assist her in multiple crimes, however different the crimes may be in other respects. Or the circumstances that led to Bego's robbery might have inspired Hungerford and her

---

**6.** Because the trial court considered that differences between the two robberies made one irrelevant to the other, on remand it dismissed Bego's testimony that Samuels was not involved in the first robbery as "beside the point."

cohorts to plan robberies in the future, including the one that resulted in the murder of Williams, along similar lines. The evidence was also relevant to show Hungerford's bias. *See Newman,* 705 A.2d at 254; *supra* notes. Although the fact-finder is free to reject such inferences, the "trial court's inquiry into the nature of Bego's testimony was to be limited" to whether the inference that someone other than Samuels committed both crimes was reasonable under the circumstances—and therefore sufficient to allow the underlying evidence to be admitted as relevant. *Newman,* 705 A.2d at 259.

The factors linking Samuels' proffered *Winfield* evidence and the Williams murder—crime (robbery), circumstances (a sex-for-money exchange), participants (Hungerford), and time (within two weeks)—stand in sharp contrast to the purely speculative evidence that this court has found irrelevant applying the *Winfield* standard. In *Wilson v. United States,* 711 A.2d 75 (D.C.1998), evidence of another murder was excluded when it had occurred in a different location with different weapons, no physical evidence or testimony linked it to the charged murder, and the only commonality was that they had both been committed within a three-day period. *See id.* at 77–78. In *Gethers v. United States,* 684 A.2d 1266 (D.C.1996), the proffered evidence consisted of testimony that the murder victim had committed other, unrelated offenses, and had thereby acquired unknown and unnamed enemies. *See id.* at 1270. That evidence did not tend to show that another party had committed the crime at issue because no actual party had been, in fact, identified. *See id.* The case at bar is distinguishable because the potential third party perpetrator was identified (through Bego's description) as someone other than Samuels and the crimes are otherwise related in both time and circumstances. Even if the trial court found the question to be close, it was obliged to "resolve close questions of admissibility in this setting in favor of inclusion, not exclusion." *Winfield,* 676 A.2d at 6.

■ The trial court also erred by ruling, in the alternative, that *Winfield* evidence may be excluded to avoid jury confusion from a trial-within-a-trial. In our remand order, we noted "several policy considerations" to be taken into account in deciding whether to exclude, on prejudice grounds, reverse-*Drew* evidence. *Newman,* 705 A.2d at 260. First, because the evidence is not being introduced against the defendant, "the only concern is admission of 'marginally relevant evidence creating the danger ... [of] distract[ing] the jury from the issue in this case.'" *Id.* Since our remand order in this case, we have said that the concern about potential jury confusion is "subordinate to the defendant's constitutional right to mount a complete defense, including misidentification." *Battle,* 754 A.2d at 318. Although the trial court may curtail testimony "to prevent the *cumulation* of third-party perpetrator evidence," *Winfield,* 676 A.2d at 7, it may not exclude otherwise admissible *Winfield* evidence based solely on a fear of jury confusion. *See id.* at 5. The requirement that evidence tend to indicate some *"reasonable possibility* that a person other than the defendant committed the charged offense" is sufficient to overcome the concern that the jury may be distracted from the issue of whether *this* defendant is guilty or not. *See id.* We have cautioned against "excessive mistrust of juries," and noted that "sifting the relevance of [*Winfield* ] evidence is largely about drawing commonsense inferences from uncomplicated facts, something we regularly entrust to juries." *Id.* at 7. Comparing the relatively simple facts of the Bego robbery with those of the robbery that resulted in Williams' murder is just this sort of task.

Second, in remanding the case we also specifically noted that the trial court must evaluate potential prejudice resulting from jury confusion against Samuels' "strong constitutional interest in a meaningful opportunity to present a complete defense," as well as "the deleterious effect on the defense of allowing the defendant to ask questions regarding bias, but refusing to allow the defendant to show the jury the basis for this line of questioning." *Newman*, 705 A.2d at 260.[7]

On remand, the trial court's balancing of probative value versus prejudice proceeded from the incorrect assumption that the probative value was "minimal at best," overstated the risk of jury confusion, and did not consider prejudice to the constitutional interest of the defense at stake. We therefore conclude that the trial court abused its discretion in applying the legal standard for admissibility, *see Winfield*, 676 A.2d at 5, and reverse and remand for a new trial.

### 2. *Newman's Ineffective Assistance of Counsel Claim.*

■ In his collateral attack filed pursuant to D.C.Code § 23–110, Newman alleged that his attorney failed to contact a known alibi witness, Catina Henson, and attached to his motion Henson's affidavit stating that he was with her at the time of the murder. The trial court found Henson's allegation to be incredible, and dismissed the motion without a hearing. *See Newman*, 705 A.2d at 260. On appeal, we held that "credibility determinations cannot be based on affidavits or countered by conclusory statements but may be resolved only by recourse to a full evidentiary hear-

ing," *see id.* at 261–62, and remanded for a hearing.

On remand the trial court held a hearing, but never had the opportunity to assess Henson's credibility. Newman's attorney—with Newman's acquiescence—told the court that Henson was available to testify, but that Newman would not call her as a witness:

> Your Honor, in terms of establishing our case, we are—I spoke to Mr. Newman about this. We are not planning to call Ms. Henson. She is under subpoena; she is accessible to me, and I guess I would like to leave open the possibility of calling her as a rebuttal witness in terms of [trial counsel], but we're not planning to call her in terms of this hearing.

When the court asked Newman if he concurred in that decision, he answered that he did. The court then heard testimony from Newman and his trial counsel who categorically denied that he had ever been told by Newman of a possible alibi defense. When asked during cross-examination how he remembered Newman out of the many cases that he had tried, trial counsel replied that this case involved an allegation of witness tampering that was unique in his experience:

> I tried this case twice. This case stands out in my mind because ... it was ... the first time in almost 30 years of practice where I had this incident involving this police officer, who actually took a witness to his apartment. It just never happened before. I mean, it stands out like a sore thumb. That's why I remember this case.... I think we had a substantial [hearing], I mean substantial,

---

7. We also noted that when the trial court initially excluded the evidence based on the proffer, *i.e.*, before we remanded the case for a hearing on the proffer, it had not evaluated its concern about a trial-within-a-trial "with reference to the constitutionally based policies favoring admission of such evidence when relevant to presenting a 'complete defense.'" *Newman,* 705 A.2d at 259.

not just a 10 minute hearing, ... Judge Alprin ... was quite concerned about this....

The trial court credited trial counsel's testimony, discredited Newman's, and explained that Newman's decision not to call Henson as a witness virtually compelled the conclusion that Newman had no alibi:

> The court credits [trial counsel's] testimony and discounts that of defendant. The fact that defendant affirmatively chose not to call an available witness essential to his ineffective assistance claim compels the conclusion that no such alibi defense ever existed. Furthermore, [trial counsel's] testimony that this case particularly stuck in his mind because of the alleged witness tampering issue is credible. The court conducted a long hearing on that unusual matter and it was, in fact, the key issue in the case.

> The court, therefore, finds as a fact that [trial counsel] never was informed of a possible alibi defense through Ms. Henson.

In this second appeal, Newman claims that the trial court erred in relying on trial counsel's memory because he had failed to recall several matters related to the case, such as the prior charges against Newman, and was unable to locate his files or notes on the matter. In addition, because trial counsel had represented literally thousands of clients in criminal cases, Newman claims that he could not have been able to recall the details of this case. Newman also asserts that the trial court committed reversible error in disbelieving his testimony when he showed no lapse in memory.

This matter was remanded to the trial court to assess witness credibility, *see Newman*, 705 A.2d at 262, and this court must "defer to the trial court's credibility determinations respecting witnesses who testify at the hearing." *Barnes v. United States*, 760 A.2d 556, 559 (D.C.2000) (cita-

tion omitted). Trial counsel's minor lapses in memory identified by Newman in matters not material to the ineffective assistance of counsel claim when compared to his strong recollection of the matter at issue—corroborated and credited by the trial court's own recollection of the case—are plainly insufficient to overcome that deference.

Thus, for the foregoing reasons, the judgment of the trial court is affirmed with respect to Newman's collateral attack, and reversed and remanded for a new trial for Samuels.

*So ordered.*