**UNITED STATES, Appellant,**

v.

**Frederick MORTON, Appellee.**

**No. 11–CO–1198.**

District of Columbia Court of Appeals.

Argued Feb. 29, 2012.

Decided Aug. 9, 2012.

Elizabeth H. Danello, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time, and Amanda Haines and Laura R. Bach, Assistant United States Attorneys, were on the brief, for appellant.

Jonathan W. Anderson, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and STEADMAN, Senior Judge.

THOMPSON, Associate Judge:

This matter is pending in the Superior Court, where defendant Frederick Morton awaits trial on charges of burglary, robbery, kidnapping, and felony murder. In this interlocutory appeal, the government challenges the trial court's ruling that precludes the prosecutor from introducing at trial evidence of defendant's longstanding heroin addiction, circumstantial evidence of his drug use on the day the offenses were committed, and defendant's admission that he committed prior burglaries to support his drug habit. The trial court recognized that defense tactics at trial might "open the door" to some uses of these types of evidence. As a general matter, however, the court excluded the prior-burglary evidence on the ground that it is propensity evidence, the admission of which is prohibited under *Drew v. United States*, 331 F.2d 85 (D.C.Cir.1964); and it excluded the drug-addiction evidence on the grounds that it, too, would amount to propensity evidence, that "corroboration cannot be supplied by [defendant's] drug use," and that, in any event, the drug-addiction evidence would be substantially more prejudicial than probative. The government argues that both categories of evidence are admissible as so-called *Toliver*[1] or *Johnson*[2] evidence, contending that defendant's heroin addiction and history of committing burglaries to support his drug habit are closely intertwined with the charged offenses and are necessary to place the charged offenses in context and to make their details understandable to the jury. Alternatively, the government contends, the evidence is admissible, under a *Drew* exception, as evidence that is probative of motive and identity.

For the reasons explained below, we affirm in part and remand in part. We agree with the trial court that, in light of the government's description of the purpose for which it would use defendant's admission about prior burglaries, the evidence cannot meaningfully be distinguished from propensity evidence. Therefore, as the trial court ruled, the evidence may not be admitted unless the defense opens the door to such evidence (e.g., as evidence of the defendant's intent, by arguing that the defendant innocently possessed a credit card that was missing and presumably stolen from the crime scene). As to the drug-addiction-related evidence, we agree with the trial court that, standing

1. *Toliver v. United States,* 468 A.2d 958 (D.C. 1983).

2. *Johnson v. United States,* 683 A.2d 1087 (D.C.1996) (en banc).

alone, it is weak evidence of motive and resembles inadmissible propensity evidence. We also are not persuaded that the drug-addiction evidence is needed to make the case understandable to the jury, and we cannot gainsay the trial court's assessment that drug-addiction evidence is highly prejudicial. However, we agree with the government that the trial court did not take into account how, in conjunction with other evidence, the drug-addiction evidence is corroborative of inferences that point to defendant as the perpetrator, is probative of identity, and thus has a legitimate purpose as non-propensity evidence. We conclude that a remand on the issue of the admissibility of the drug-addiction evidence is warranted, so that the trial court may undertake anew its task of weighing the probative value of the evidence against its potential prejudicial effect.

## I.

The government expects to present evidence that, on January 21, 1997, between 2:30 and 3:00 in the afternoon, the body of Sharon Moskowitz was found lying on the floor in the front vestibule of the house where she lived, located at 1971 Biltmore Street, N.W. Moskowitz had been strangled a short time before she was found. There were pry marks on the front door of the house, the door jam and lock mechanism were broken, the entire house had been ransacked, and a number of items were missing, including credit cards, pennies and other small change, and jewelry. Among the items not taken were televisions and other electronic equipment, bicycles, cameras, and tools. No fingerprint or DNA evidence was recovered from the crime scene.

The government's theory is that Moskowitz was attacked as she returned home with bags of groceries, interrupting a burglary in process. A crime scene photo shows grocery bags and groceries scattered on the floor around her body. The scattered groceries included an unopened bottle of water and a container of orange juice. The carton of orange juice was open (i.e., its twist-off cap and safety seal had been removed) and was found standing upright. The government theorizes that the perpetrator opened the container and drank some of the orange juice.

Using records obtained from the issuer of one of the missing credit cards, police learned of several transactions with the card that occurred within hours after the murder. The first such transaction occurred at a gas station about 45 minutes after Moskowitz's body was found. The government apparently has no direct evidence about who used the credit card during that transaction. There was a transaction just before 5:00 p.m. at the Safeway store at the Waterside Mall in the Southwest quadrant of the District. Another of the transactions occurred at a Giant Food store in Marlow Heights, Maryland (the "Marlow Heights Giant") a few hours later. Another occurred at a Giant Food store at 8th and O Streets, N.W. (the "8th & O Giant"), near midnight the same day. Metropolitan Police Department detectives obtained Giant Food video surveillance footage corresponding with the times at which the Marlow Heights and 8th & O Giant transactions occurred. However, the video footage and photographic stills from the videos are grainy, making it difficult to discern facial features. Surveillance footage from the Marlow Heights Giant captured an individual wearing a gray "PITT" sweatshirt and using the credit card to purchase groceries. Video surveillance footage from the 8th and O Giant shows an individual wearing a "PITT" sweatshirt accompanied by a wom-

an and shopping for groceries (including orange juice).

Soon after the murder, the video footage obtained from the Marlow Heights Giant was broadcast by "America's Most Wanted" and other media outlets. The broadcasts did not lead to information that enabled police to identify the man in the "PITT" sweatshirt shown in the video. However, responding to one of the media broadcasts, an individual by the name of Morris Brown informed police in February 1997 that, on the day of the murder, at approximately 6:00 p.m., he was in the parking lot of a liquor store when an individual wearing a "PITT" shirt, whom he referred to as "Shorty," approached him and offered to buy him groceries in exchange for cash. Brown, who is now deceased, told police that he accepted the offer and then drove "Shorty" to the Marlow Heights Giant. There, Brown spent about twenty minutes selecting groceries and then waited in his car while "Shorty" paid for the groceries. Brown informed police that he gave "Shorty" $40 in exchange for nearly $200 worth of groceries. Brown told police that he did not know "Shorty's" true identity.

Twelve years passed before police received information that pointed them to defendant Morton. For reasons not explained in the record, the video surveillance footage from the 8th & O Giant was not broadcast by the media until 2009. In August 2009, another witness, whom the arrest warrant affidavit refers to as "W–4," provided information that, on January 21, 1997, the day of the murder, a man wearing a "PITT" sweatshirt approached him and offered to buy him groceries in exchange for cash. W–4 drove the man to the Waterside Mall Safeway. W–4 selected groceries and then left his shopping cart with the man, exited the store, and waited outside the store. Thereafter, W–4 gave the man $80 in exchange for $200 worth of groceries. Police were unable to recover video surveillance footage from the Waterside Mall Safeway, but they showed W–4 still photographs of the individual wearing the gray "PITT" sweatshirt captured from the Marlow Heights Giant video. W–4 identified the individual wearing the gray "PITT" sweatshirt as the same man from whom he had purchased groceries at the Waterside Mall Safeway.[3] W–4 also told police that the man "sniffled and acted jumpy as if he had a drug problem, specifically a heroin addiction."

In November 2009, in response to a television broadcast of the 8th & O Giant surveillance video, another witness (whom the arrest warrant affidavit refers to as "W–5") identified the man in the "PITT" sweatshirt and the woman accompanying him. W–5 identified the woman as W–5's good friend Joan Williams and identified the man in the "PITT" sweatshirt as "Butch," a man with whom Williams (who died of a heroin overdose in October 2009) had lived for at least nine months in 1997 (including at the time of the murder).[4] W–5 told police that W–5 and Butch used heroin together and that Butch "made money by cashing stolen checks and other illegal scams." When shown a photograph of defendant Morton, W–5 told police, "that's Butch right there." A police rec-

3. The government disclosed in a discovery letter to the defense that another witness reported that the person who tendered the credit card missing from the crime scene during the Waterside Mall Safeway transaction was wearing a different type of shirt—i.e., not the "PITT" shirt shown in the Giant Food surveillance videos.

4. The government also has evidence that, in 1995, defendant admitted that he was in a common-law relationship with Williams.

ords check revealed that defendant Morton used the nickname "Butch."

Two other witnesses also saw the broadcast of the 8th & O Giant surveillance video and came forward to identify the man in the "PITT" sweatshirt as defendant Morton. One of these witnesses ("W–2") is a family member of defendant.[5] The second of these witnesses, referred to as "W–3," told police that the witness had known defendant, both by his nickname and legal name, "for decades," since they were teenagers, and that in their "young years," the witness joined Morton in using drugs and committing criminal "capers," including burglaries, to obtain drugs. The 8th & O Giant video shows the man in the "PITT" sweatshirt rubbing his nose back and forth, and the government proffers that W–3 will testify that this gesture is what defendant Morton "does when he's using."

The government asserts that defendant Morton "is a longtime heroin addict who supports his addiction through burglaries and other crimes" and contends that he "committed the charged offenses out of a desperate need to support his heroin addiction."[6] The government has the following additional evidence that it contends supports those assertions. At trial in another case in 2002, defendant admitted that he had been a heroin addict for thirty years and had committed burglary and credit card fraud to support his drug habit. He told a probation officer in 2001 that he used heroin "virtually every day" since he

was 18 years old, and that "in recent years," he was using four bags of heroin and two $10 bags of cocaine every day. In addition, he told a pre-sentence report writer in 1995 that he broke into a house in Georgetown because he needed money for drugs. In addition, police learned information from defendant sometime during 2000 that he had committed previous burglaries on Biltmore Street, N.W. The parties have agreed to stipulate that Morton admitted to being on Biltmore Street prior to October 2000.

## II.

The government's brief identifies four categories of evidence that are in dispute in this appeal: (i) defendant's "admissions that he has committed burglaries to support his drug habit"; (ii) his "longstanding heroin addiction"; (iii) witnesses recognition of defendant from surveillance videotapes "based on their shared drug history and [defendants] physical manifestations of drug use"; and (iv) expert testimony about drug addiction.[7] As already briefly described, the government argues that this "other crimes" or "prior bad acts" evidence "is admissible under *Johnson* and *Toliver* because it is closely intertwined with the charged offenses. The government also contends that the evidence is admissible under *Drew* as "additional evidence of identification" (and of motive, "which is related to identity"). The government asserts that the trial court failed to recognize the probative value of the excluded evidence because it looked at the evidence in

5. The government disclosed to the defense in a discovery letter, however, that defendant's sister "is of the opinion that the surveillance video from the Giant grocery store does not, in her opinion, look like her brother Frederick in that the face is longer and the body is bigger."

6. The government points to defendant's "shopping at the 8th and O Streets Giant

shortly before midnight" on the day of the murder as evidence that "[o]nce [defendant] had gained the necessary cash, he returned to … the heroin-trafficking 'strip' at 7th and O Streets."

7. In the discussion in the text below, we consider categories (ii) and (iii) together.

isolation rather than in conjunction with other government evidence; that this error distorted the court's balancing of the evidence's probative value against its potential to prejudice the defendant; and that the court "inflated" the potential prejudicial effect of the evidence in dispute and failed to consider how any prejudice can be alleviated through a limiting instruction.

### III.

In our jurisdiction, "[i]t is fundamental that evidence of prior bad acts independent of the crimes charged is inadmissible to show the defendant's disposition or propensity to commit the charged offenses, from which the jury improperly could infer the defendant actually did commit them." *Harrison v. United States*, 30 A.3d 169, 176 (D.C.2011); *see also Drew*, 331 F.2d at 89 ("[E]vidence of one crime is inadmissible to prove [a] disposition to commit crime, from which the jury may infer that the defendant committed the crime charged."). Evidence of prior bad acts may be admissible, however, when relevant to factors such as motive, intent, or "the identity of the person charged with the commission of the crime on trial." *Drew*, 331 F.2d at 90. In addition, "*Drew* will not work to exclude evidence where the evidence is direct and substantial proof of the charged crime, closely intertwined with the evidence in the case, or necessary to understand what happened," *Burgess v. United States*, 786 A.2d 561, 569 (D.C. 2001), i.e., "to place the charged crime in an understandable context." *Johnson v. United States*, 683 A.2d 1087, 1097 (D.C. 1996) (en banc). Other-crimes evidence may be admissible "to complete the story of the crime on trial by proving its immediate context...." *Toliver v. United States*, 468 A.2d 958, 960 (D.C.1983) (citation and internal quotation marks omitted).

However, even if evidence falls outside *Drew* or within a *Drew* exception and thus is otherwise admissible, it must be excluded if the trial court determines that its probative value "is substantially outweighed by the danger of unfair prejudice[.]" *Johnson*, 683 A.2d at 1090. In deciding whether the danger of unfair prejudice from other-crimes evidence substantially outweighs the probative value of the evidence, the trial court should consider a variety of factors, including "the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." *Id.* at 1095 n. 8 (quoting John Strong, I McCormick on Evidence 190 (4th ed. 1992)); *see also Old Chief v. United States*, 519 U.S. 172, 184, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (in assessing probative value, the court may consider evidentiary alternatives); *Easton v. United States*, 533 A.2d 904, 906 (D.C. 1987) ("[B]ecause there is substantial risk that [other crimes] evidence will unfairly prejudice the defendant, there must be a reasonable need for the evidence and it must promise a real contribution in the process of proof.") (citations and internal quotation marks omitted).

"We review a trial court's decision to admit or exclude evidence for abuse of discretion." *Riddick v. United States*, 995 A.2d 212, 216 (D.C.2010). "[W]e recognize that the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Johnson*, 683 A.2d at 1095. In determining whether the trial court properly exercised its discretion, we consider *inter alia* whether the court "failed to consider a relevant factor." *Johnson v. United States*, 398 A.2d 354, 363, 365 (D.C.1979).

## IV.

### A. Defendant's *"admissions that he committed burglaries to support his drug habit"*

■■■ We begin our discussion by acknowledging the parties' dispute about whether this category of evidence is properly a subject of this appeal. Defendant asserts that, before the trial court, the government *"conceded* that evidence of Mr. Morton's admissions that he committed burglaries to support his drug habit would be too prejudicial, and would amount to propensity evidence," and therefore "modified its position and represented that it would *not* seek to introduce evidence that Morton admitted that he committed other crimes to get funds, but only to admit evidence that Morton was a heroin addict." In contrast, the government asserts that it "did not withdraw its request," that its statements in the transcript to which defendant points merely reflected the "consensus in the courtroom that the court had excluded [the] evidence," and that at worst the record is "ambiguous" on this point. We need not resolve this dispute since we conclude in any event that the trial court's ruling generally excluding the evidence must be upheld.

In ruling that it would not permit the jury to hear the evidence of defendant's prior burglaries (or other prior criminal "capers"), the trial court ruled that "given the nature of this case[,] ... to bring up the ... burglaries [defendant] did ...

would go to propensity" and would have a prejudicial effect. No extended discussion is required to explain why we discern no abuse of discretion in that ruling, because the prosecutor's explanation of the intended use of the evidence demonstrates why it cannot meaningfully be distinguished from propensity evidence. The prosecutor explained that the evidence of prior burglaries would be admissible if the defense disputes that defendant stole the credit card because "[i]n fact what he does and what he has a history of doing is stealing things and then using them." Continuing that theme, the prosecutor added that the evidence would go toward establishing that "[h]e took that credit card" because, "That is what he does. That is what he has always done." The prosecutor's description shows quite clearly that the intended use of the prior-burglary evidence is as classic propensity evidence. The trial court did not err in ruling that the evidence generally must be excluded.[8]

### B. Defendant's *"daily drug use and longstanding heroin addiction"* and the evidence that he was *"using"* on the day of the burglary and murder

1. The probative value of the drug-addiction evidence as *Johnson/Toliver* evidence

■■■ The government's brief contends that presentation of the evidence of defendant's drug addiction is necessary to place what happened at the crime scene in an understandable context. The government

---

8. We note that the trial court also remarked—and the defense agreed—that if defendant admits at trial that he possessed the stolen credit card but contends that he did not know it was stolen, the evidence of his prior burglaries would be probative of his intent and could be admissible on that basis. That is, the trial court observed that if the defendant were to say, "I possessed them, but I didn't know they were stolen," the government would want to show that "he possessed cards in the past [and] ... knew they were stolen." The court then asked defense counsel, "if [defendant] was saying that, you'd agree the case law supports the proposition that [the government] could bring up other things in the past to show that it wasn't innocent possession ...?" Defense counsel responded, "If Mr. Morton denied knowledge that they were stolen items, yes, we're in agreement."

insists that some aspects of the case—such as why the intruder murdered Moskowitz instead of just aborting his mission and fleeing when she returned home, why he stole items of small value such as loose change while forgoing items of greater value, why the intruder (apparently) stopped to drink orange juice, why he used the credit card so recklessly right after the murder, and why he agreed to such unfavorable terms when he purchased groceries for others—make little sense" (or, as counsel put it in the vernacular at oral argument, seem "just plain weird") without evidence about the defendant's desperate need for heroin, and about what the government's expert would opine may be defendant's addiction-related craving for sugary substances such as orange juice.

We are not persuaded that the jury needs the drug-addiction evidence to derive a coherent story from the evidence. As the trial court reasoned and defense counsel agreed, even without the evidence of drug addiction, the evidence suggests that the crimes likely were the acts of a "desperate person." Like the trial court, we discern no reason why the jury would be stymied for lack of an explanation as to why the perpetrator took smaller items rather than larger ones or drank orange juice. This does not appear to be a case in which the government needs drug-addiction evidence to "explain[ ] an action that otherwise would [be] argued to be motiveless on [defendant's] part and thus open to reasonable doubt on identification." *Lazo v. United States*, 930 A.2d 183, 186 (D.C. 2007). It also does not appear that the

drug-addiction evidence will be "indispensable to the jury's understanding" that the elements of burglary, kidnapping, murder and robbery were present in this case. *Cf. Settles v. United States*, 615 A.2d 1105, 1110 (D.C.1992) (explaining that the evidence of appellant's drug use "put before the jury . . . [the] effect on his . . . mental state at the precise moment of the shooting"). Nor does this appear to be a case in which requiring the government to leave out other-crimes evidence would unfairly prejudice the government by engendering hostility toward the government's witnesses or by otherwise undermining their credibility. *Cf. McGriff v. United States*, 705 A.2d 282, 284 (D.C.1997) (reasoning, in case where the defendant was charged with weapons offenses, that evidence of defendant's reckless driving and traffic offenses just before officers stopped him was admissible under *Toliver*, because if the "full factual context" had been omitted, and "if the government had been required to begin its story at the moment when the officers saw [an] object being thrown from the window" of defendant's vehicle, the "jury would not have understood what happened" and why the officers so aggressively pursued the defendant).[9] We discern no abuse of discretion in the trial court's reasoning that, balanced against what the court called the "highly inflammatory" evidence of heroin addiction, the drug-addiction evidence can be expected to have a prejudicial effect that substantially outweighs whatever probative value it has in terms of giving the jury a complete picture of what happened.

---

**9.** *See also United States v. Lewis*, 701 F.2d 972, 974–75 (D.C.Cir.1983) (concluding that the trial court did not err in allowing evidence that the defendant had an outstanding arrest warrant for assault in another matter, since "the propriety of the behavior of the police seemed to be in question," and the evidence was necessary to avoid leaving the impression that police officers had behaved in a high-handed way toward the defendant, and because, without the other-crimes evidence, "[s]ome of the jurors might well have wondered if the police behavior was not so unreasonably harsh as to cast doubt on the charges").

2. The probative value of the drug-addiction evidence as evidence corroborative of defendant's identity as the perpetrator

The trial court rejected the government's argument that the evidence of defendant's heroin addiction should be admitted as motive or identity evidence, reasoning that "a lot of people" "commit burglaries because they have an addiction" and that defendant's drug addiction does not show "his identity as the person, as opposed to the ... hundreds of people who have drug habits who commit burglaries." [10] The court also reasoned that motive is "not a material issue in this case" since "[w]hoever committed this burglary did it for money," and since the obvious motive for the murder was that the perpetrator "was caught in the middle of a burglary." [11] The court observed that the government's argument came down to "[h]e's an addict with a serious habit, so therefore it's likely that he committed this crime in this situation ... That's propensity."

The government argues that the trial court was able to conclude that the drug-addiction evidence was not "probative of [the perpetrator's] identity as opposed to everyone else who's addicted to drugs" because, erroneously, it failed to analyze the probative value of the drug-addiction evidence "in context rather than in isolation." *Robinson*, 623 A.2d at 1240. When considered in combination with the other proffered evidence and the inferences flowing from that other evidence, the government contends, the drug-addiction evidence is "important corroborative evidence" identifying defendant as the burglar, and not "just a screen for introducing improper propensity evidence."

■ We are satisfied that the drug-addiction evidence has probative value as evidence corroborative of defendant's identity as the perpetrator, and that, used for that purpose, it would not amount to prohibited propensity evidence. To be sure, the drug-addiction evidence could be characterized as propensity evidence, just as other types of permissible other-crimes ev-

---

10. The trial court relied on this court's analysis in *Robinson v. United States*, 623 A.2d 1234 (D.C.1993), in which we cautioned that "where motive evidence is proffered to prove identity, the trial court must take care to verify that the evidence is actually specific enough to aid in differentiating the defendant from other possible suspects." *Id.* at 1239. We observed that "[w]hen motive evidence is offered to show identity, its probative value decreases insofar as the motive attributed to the defendant is either (a) so common that it embraces a large class of other possible suspects or (b) so generalized that it embraces a large class of potential victims." *Id.* Quoting a treatise, we said:

If the defendant is the only person so motivated, the evidence can be strong; e.g.[,] the desire of a criminal for revenge against those who testified against him. But where the motive is one shared with many others with opportunity to have committed the crime, prejudice is often thought to out-

weigh probative worth; for example, proof that defendant is an addict offered to show a motive for a burglary.

*Id.* (footnotes omitted) (quoting 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5240, at 483 (1978)). Similarly, we observed, "where the suggested motive relates only to a broad class of possible victims, it may be of little value in showing that the defendant committed a particular act against a particular victim.... The more common or generalized the motive evidence, the more it verges upon inadmissibility as mere propensity evidence." *Robinson*, 623 A.2d at 1239; *see also Harrison*, 30 A.3d at 178 (D.C.2011) (same).

11. *Cf. Wright v. United States*, 570 A.2d 731, 736 (D.C.1990) ("The motive or intent of whoever broke into the Video Place store and stacked up the merchandise in January 1985 was undisputed; whoever broke in wanted to steal the merchandise. The contested issue was whether appellant broke into the store.").

idence could be. For example, as one court has recently pointed out, "one of the paradigmatic [legitimate] uses of other [bad] acts evidence is the use of previous acts to establish a modus operandi, or 'signature,' that is methodologically so reminiscent of the charged crime as to earmark it as the defendant's handiwork. It is well established that such evidence is admissible when the acts are sufficiently similar to be probative on the issue of identity—yet it is equally clear that the . . . relevance of the evidence depends on what can be characterized as the defendant's 'propensity' to commit crimes in an idiosyncratic way." *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213, 233 (2012). Such evidence may be admitted, however, because "an inference of a criminal propensity is not required to establish [the evidence's] independent relevance." *Id.*[12]

Similar reasoning applies here. Although defendant Morton's admissions about his longstanding drug addiction and the evidence suggestive of his active drug use on the day of the Biltmore Street burglary may be reflective of his character, and may suggest that he has criminal

propensities, the relevance of the evidence is logically independent of those possibilities. The relevance of the drug-addiction evidence is based on the inference that the burglary was committed by a desperate person (an inference that the trial court has already specifically ruled the government will be permitted to argue) and on the common recognition that a drug-addicted individual is one type of desperate person.[13]

In fuller context, the relevance of the drug-addiction evidence as corroborative evidence is premised on the following reasoning:

(1) The evidence (per the statements of W–3 and W–5) that defendant Morton is the man shown in the 8th & O Giant surveillance video, recorded at the time the stolen credit was used there, creates an inference that defendant stole the credit card;[14]

(2) The parties have agreed to stipulate that defendant was on Biltmore Street prior to 2000, creating at least a weak inference that defendant was familiar with Biltmore Street in January 1997;

---

**12.** The court in *Torres*, which involved a prosecution for murder and robbery, considered the admissibility of evidence that Torres had previously committed a kidnapping in order to obtain transportation to Texas (he released his victims "only after [victim] Cross agreed to drive Torres to Texas"). *Id.* The court held that this other-crimes evidence was admissible in Torres's murder/robbery trial, in which the government alleged that Torres stole one victim's car, "which was later found in Texas." *Id.* The court reasoned that the evidence surrounding the earlier kidnappings was "independently relevant because it proved Torres' rather desperate desire for money and transportation to Texas." *Id.* The court observed that "[a]lthough the evidence also reflects poorly on Torres' character, its logical relevance is independent of that." *Id.* at 233–34.

**13.** *See, e.g., United States v. Mitchell*, 172 F.3d 1104 (9th Cir.1999) ("[A]ddiction establishes

a likelihood of desperate need[.]"); *Oliver v. United States*, 682 A.2d 186, 192 (D.C.1996) (quoting testimony that "too many crimes are committed over drugs, either by addicts desperate to obtain them") (internal quotation marks omitted); *cf. United States v. Holt*, 817 F.2d 1264, 1270–71 (7th Cir.1987) (holding, in case in which defendant Holt was tried for conspiracy to commit bank robbery, that evidence of his prior theft of checks from a hospital was admissible to rebut the claim that Holt's "money problems were not so desperate that they would have motivated him to rob a bank").

**14.** *See White v. United States*, 300 A.2d 716, 719 (D.C.1973) ("[T]he possession of recently stolen goods gives rise to an inference that the possessor has stolen the goods[.]") (citation omitted).

(3) The evidence from the crime scene creates an inference that the person who committed the Biltmore Street burglary was a "desperate person"; and

(4) The drug-addiction evidence (i.e., the evidence that defendant has been a heroin addict for thirty years and the circumstantial evidence, from W–3's statement, that defendant used heroin on the day of the burglary) corroborates the inference from (1) and (2) that defendant stole the credit card during the Biltmore Street burglary, because the drug-addiction evidence is consistent with the inference in (3) that the burglar was desperate.

Stated differently, in conjunction with the inferences in (1)-(3), the evidence of defendant's heroin addiction and active drug use on January 21, 1997 corroborates the inferences that place him within a narrowed pool of potential perpetrators, and increases the likelihood that he was the "desperate person" who burglarized 1971 Biltmore Street.

The drug-addiction evidence thus has legitimate, probative value that does not rest on inferring conduct from criminal proclivity. If the trial court failed to take into account that probative value, as the government suggests, we think this can be attributed to the court's expressed views (what the court called "the bottom line") that "corroboration cannot be supplied by [defendant's] drug use," and that the drug-addiction evidence's corroboration of inferences (i.e., its "lack of corroboration out-side of the inference") is a "problem" and is not "real evidence of corroboration." While the meaning of the court's statements is not crystal clear, the statements may reflect a misapprehension of the law. This court has recognized that "evidence of other crimes or acts is admissible to corroborate evidence that itself has a legitimate non-propensity purpose." *Jones v. United States*, 27 A.3d 1130, 1146 (D.C. 2011); *see also United States v. Bowie*, 232 F.3d 923, 933 (D.C.Cir.2000) (collecting cases). We also see no reason why other-crimes evidence, like other types of evidence, may not be admitted to corroborate an inference (rather than to corroborate direct evidence). *Cf. United States v. Johnson*, No. 99–4004, 1999 WL 731355, 1999 U.S.App. LEXIS 22778 (4th Cir. Sept. 20, 1999) (discussing evidence that "corroborate[d] the inference" of the defendant's guilt of robbery from his possession of stolen money). Because of the trial court's apparent view that the drug-addiction evidence in this case, as other-crimes evidence, could not be used to corroborate the inference of defendant's guilt created by other evidence in the case, we cannot be sure that the trial court gave adequate weight to the probative value of the drug-addiction evidence when it balanced that probative value against the evidence's potential prejudicial effect.[15] This may also have affected the weight the court gave to the probative value of the drug-addiction evidence in corroborating other aspects of the government's case.[16]

**15.** We note that the trial court did leave open the possibility that testimony by W–3 about his familiarity with the defendant's drug use could become admissible if the defense "goes too far, [and] open[s] the door to it," such as by suggesting that W–3, whose association with defendant apparently ended sometime before 1997, now "has some kind of bias" against the defendant. That circumstance, the court contemplated, could provide a basis for allowing W–3 to explain, more benignly, that W–3 and defendant used drugs together until W–3 "was getting [his] life straightened up, and [defendant] wasn't."

**16.** For example, defendant's admissions about his drug addiction bolster W–3's statement that he was able to identify defendant as the man in the video because of the nose-rubbing gesture he makes "when he's using"

We are also given pause by the trial court's statement (which government counsel highlighted at oral argument) that the government's "need for [the drug-addiction] evidence is not part of my consideration" in weighing prejudice against probative value. Our case law establishes, to the contrary, that the government's "reasonable need [for evidence is] a factor to be considered in the balancing of probative value against prejudice regarding otherwise admissible evidence." *Johnson,* 683 A.2d at 1094; *see also Thompson v. United States,* 546 A.2d 414, 427 (D.C.1988) ("[O]ne factor to be considered in weighing probative value against prejudicial effect is the government's need for the other crimes evidence."). The court did give some consideration to the strength of the government's evidence: It twice noted that the government will have to resort to the inference that the possessor of recently stolen property is the thief, which the court observed is a "very powerful inference, very strong inference." However, the court did not specifically discuss the limited reach of that inference, i.e., that "the bare possession of the stolen property" is "is not ordinarily proof or prima facie evidence of burglary." *White,* 300 A.2d at 719; *see also Hawthorne v. United States,* 476 A.2d 164, 168 (D.C.1984) (explaining that proof of burglary requires in addition "evidence calculated to place the accused in the premises in which the theft occurred"). The court also did not discuss (and may not have been aware of) other evidence in the record that may detract from the strength of the video surveillance evidence (such as the statement by defendant's sister that the man depicted in the 8th & O Giant surveillance video does not look like defendant, and the statement by a witness at the Waterside Mall Safeway that the man who conducted a transaction with the stolen credit card wore a shirt unlike the "PITT" shirt shown in the surveillance videos).

This is not a case in which we can say that the various inferences and statements need no corroboration, such that the trial court must inevitably conclude that the prejudicial effect of the drug-addiction evidence substantially outweighs its probative value in helping to prove that defendant was the burglar. The government has no direct evidence placing defendant at the scene of the crimes, possibly making pertinent the principle that "the more essential the evidence, the greater its probative value, and the less likely that a trial court should order the evidence excluded." *United States v. King,* 713 F.2d 627, 631 (11th Cir.1983). At the same time, this court has long recognized the prejudicial effect of evidence of a defendant's drug addiction.[17] The government urged the

(a statement whose credibility will be important if the defense disputes that defendant is the man shown in the video). W–5's statement about recognizing defendant based on their shared history of drug use is corroborated by defendant's admissions about his heroin addiction, and both corroborates and is corroborated by W–3's statements about defendant's heroin use. Similarly, the statement by W–4 that the man from whom he purchased groceries at the Marlow Heights Giant "sniffled and acted jumpy as if he had a drug problem, specifically a heroin addiction" is corroborated by defendant's admitted addiction and by other witnesses' statements about

defendant's drug use, and corroborates the inference, created by the identification of defendant as the man shown in the 8th & O Giant surveillance video, that defendant also was the man who used the stolen credit card earlier in Marlow Heights.

17. We observed many years ago, "it has become increasingly evident that the problem of urban crime is largely a problem of heroin addiction" and that "[i]t is well known that most addicts support their habits through criminal activities." *Gorham v. United States,* 339 A.2d 401, 403, 410 (D.C.1975); *see also Brown v. United States,* 683 A.2d 118, 128

trial court to find that the drug-addiction evidence has a lessened prejudicial value in this case since the "other crimes" evidence is not "of a magnitude greater than the charged offense, i.e., murder[.]" This overlooks the fact that this is also a case about a daytime burglary, one of the types of "petty" crimes that the government's narcotics expert would testify is "a way [for narcotics users] to pay for their habit[.]"

We are left with the question of whether a fuller assessment of the probative value of the drug-addiction evidence as corroborative evidence would affect the court's balancing of probative value against prejudicial effect—a question we are unable to answer. The trial court might once again conclude that what it regards as the "extremely prejudicial" nature of the drug addiction evidence tips the scales in favor

(D.C.1996) (referring to the "obvious prejudicial effect" of evidence of drug use).

18. *Cf., e.g., Samuels v. United States,* 810 A.2d 918, 924 (D.C.2002) (remanding where the trial court "undervalued the relevance of the proffered ... evidence, [and] accordingly over-emphasized the risk of jury distraction and trial-within-a-trial that the evidence would create"); *Brown,* 683 A.2d at 126, 128 (remanding for the trial court to exercise its discretion to determine whether the probative value of proposed cross-examination was sufficient to offset its prejudicial effect, where the court previously had "appl[ied] an unduly restrictive legal standard" regarding when cross-examination on the subject of drug use could be admitted).

On remand, if the court determines that at least some of the drug-addiction evidence may be admitted, it will need to consider each item of such evidence separately for its corroborative value. We agree with the observation that "[t]he notion that the more other crimes evidence the prosecution is permitted to introduce, the more it is entitled to get in is misguided." *United States v. Everett,* 825 F.2d 658, 660 (2d Cir.1987). As for W–4, we note that he was able to provide a detailed physical description of the man in the "PITT"

of excluding the drug addiction evidence; or, it might conclude that the prejudice such testimony will cause is "not unfair [but] instead, merely the negative result of the testimony's [legitimate] probative value." *United States v. Cruz,* 352 F.3d 499, 506 (1st Cir.2003). We conclude that we should remand for the court to conduct anew its discretionary balancing of the probative value of the evidence of defendant's drug addiction against its prejudicial effect, guided by the discussion above of the evidence's corroborative value.[18] As part of the analysis, the court should also consider whether the prejudice could be lessened through a limiting instruction.[19]

### C. Expert testimony about drug addiction

■ The government seeks to call a narcotics expert to testify concerning "(1)

sweatshirt who purchased groceries at the Waterside Mall Safeway (describing him as an "African American male, 5′6″–5′7″ in height, 35–40 years of age, with short 'nappy' hair, a wide or big forehead, jagged teeth, bad skin, a scraggly beard, [and] wearing thick prescription glasses"—a description that we surmise matches the defendant). Thus, the jury will have that detailed description to assist it as it evaluates the reliability of W–4's identification of the man in the 8th & O Giant video (identified by other witnesses as the defendant) as the same man whom W–4 encountered at the Waterside Mall Safeway; W–4's reference to the man's having displayed symptoms of heroin addiction may add little.

19. *See Thompson,* 546 A.2d at 426 (noting that when limiting instructions "contain realistic rather than theoretical distinctions, and when they are clearly and understandably delivered, they will reduce, if not dissipate, the danger of unfairness and prejudice" and that "[i]n weighing probative value against prejudicial effect, courts should inquire as to whether the risk of prejudice has been or can be meaningfully reduced by the trial judge's instructions"). This addresses the government's argument that the trial court failed to "consider how properly worded instructions could limit the risk of unfair prejudice."

the need for narcotics users to develop a way to pay for their habit, which generally involves repeated involvement in petty criminal activity such as selling bootlegged CDs, credit card fraud, day time burglaries, etc."; and. (2) symptoms that addicts, especially heroin addicts, demonstrate such as swollen hands, sniffing, etc. and the tendency of many narcotics users to routinely crave certain foods, to include sugary substances such as candy, juice, junk food, etc." For the same reasons that led us to uphold the trial court's ruling that the evidence of defendant's admission about prior burglaries is inadmissible, we uphold its ruling that the government may not present expert testimony on the matters described in clause (1) above. Whether the government may present expert testimony on the matters described in clause (2) above depends on whether, upon re-weighing the probative value of the drug-addiction evidence as identity evidence against the prejudicial effect of that evidence, the trial court determines to permit at least some of the drug-addiction evidence to be introduced. If the court rules that the evidence may be admitted, we see no reason why expert testimony about the physical symptoms of addiction, as relevant to the other drug-addiction-related evidence in the case, may not be admitted. If the court again rules that the prejudicial effect outweighs the probative value, then the expert testimony becomes irrelevant and inadmissible.

## V.

For the foregoing reasons, we uphold the trial court's ruling excluding evidence that the defendant committed prior burglaries, and we direct the trial court to re-weigh the prejudicial effect of the drug-addiction evidence against the probative value of that evidence as evidence corroborating defendant's identity as the perpetrator of the Biltmore Street burglary.

We remand for further proceedings consistent with this opinion.

*So ordered.*